863 So.2d 246 (2003)
Frederick W. CUMMINGS-EL, Appellant,
v.
STATE of Florida, Appellee.
Frederick W. Cummings-El, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-1501, SC02-1784.
Supreme Court of Florida.
October 9, 2003.
*247 Tony Moss, Miami, FL; and Sara K. Dyehouse, Tallahassee, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Steven R. Parrish, Assistant Attorney General, Miami, FL, for Appellee/Respondent.
PER CURIAM.
Frederick W. Cummings-El appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Cummings-El also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's order denying Cummings-El's rule 3.850 motion, and we deny Cummings-El's petition for a writ of habeas corpus.

BACKGROUND
The facts of this case, as set forth in this Court's direct appeal opinion, are as follows:

*248 The defendant, Fred Cummings-El, dated the victim, Kathy Good, for a short period and the two lived together for several months. After the relationship ended, Cummings-El harassed Good and she eventually obtained a restraining order after he assaulted her at a neighbor's house. He then made numerous verbal threats, such as: "Kathy, I'm going to kill you. Kathy, I'm going to kill you [ ]"; and "I love her. If I can't have her, nobody [can] have her."; and finally "If I can't have you, ain't nobody going to have you."
Cummings-El broke into Good's home in the early morning hours of September 16, 1991, and stabbed her several times while she was sleeping, killing her. Several people heard Good's screams and saw Cummings-El at the scene. Good's eight-year-old son, Tadarius, was asleep in bed with his mother and awoke to see Cummings-El "punching" his mother. Good's twenty-year-old nephew, Michael Adams, was asleep on the floor of Good's bedroom and saw Cummings-El fleeing from the house. And Good's mother, Daisy Adams, confronted Cummings-El as he was leaving the bedroom. Cummings-El, whose face was only one or two feet from Daisy's, shoved Daisy to the ground and ran. Good then staggered from the bedroom and collapsed in her mother's arms, saying "Fred, Fred."
Cummings-El v. State, 684 So.2d 729, 730-31 (Fla.1996).
The jury convicted Cummings-El of first-degree murder and armed burglary, and recommended death by an eight-to-four vote. The trial court followed the jury's recommendation and sentenced Cummings-El to death, finding four aggravating circumstances: (1) Cummings-El had three prior violent felony convictions; (2) the murder was committed during the course of a felony; (3) the murder was heinous, atrocious, or cruel (HAC); and (4) the murder was cold, calculated, and premeditated (CCP). The trial court found no mitigating circumstances. State v. Cummings-El, No. 91-32268 (Fla. 11th Cir. Ct. order filed Feb. 19, 1993). Cummings-El appealed his conviction and sentence to this Court, raising six issues.[1] This Court affirmed the conviction and sentence of death. Cummings-El v. State, 684 So.2d 729 (Fla.1996).
On May 26, 1999, Cummings-El filed an amended rule 3.850 motion for postconviction relief, raising eleven issues.[2] The *249 postconviction court held a Huff[3] hearing and thereafter summarily denied all but one of Cummings-El's claims. The court granted an evidentiary hearing regarding Cummings-El's claim that trial counsel was ineffective for failing to investigate and present mitigating evidence at the penalty phase of trial.
After the Huff hearing, Cummings-El expressed dissatisfaction with his attorney. The postconviction court conducted an inquiry into Cummings-El's claim, discharged the attorney, and appointed a new attorney. On June 22, 2000, Cummings-El filed a second amended rule 3.850 motion for postconviction relief, raising three additional issues.[4] On July 13, 2000, Cummings-El filed a third amended motion for postconviction relief, raising one additional claim.[5]
On September 25, 2000, the postconviction court held a second Huff hearing on Cummings-El's newly added claims. The postconviction court found that Cummings-El's additional claims were technically untimely, but because counsel had been recently appointed and investigated the additional claims in a reasonable period of time after his appointment, the court agreed to consider the additional claims. The court thereafter summarily denied claims twelve and thirteen. The court determined that claim fourteen would be considered as a supplement to claim five. Finally, the court denied claim fifteen without prejudice for defense counsel to obtain a sworn affidavit of recantation or sworn testimony subject to cross-examination from Tadarius Williams. If defense counsel produced such evidence, the court agreed to hear claim fifteen at the previously scheduled evidentiary hearing. State v. Cummings-El, No. F91-33268 (Fla. 11th Cir. Ct. order filed Oct. 11, 2000).
Following the evidentiary hearing, the postconviction court entered a final order denying all relief. State v. Cummings-El, No. F91-33268 (Fla. 11th Cir. Ct. order filed June 14, 2002). Cummings-El now appeals the postconviction court's denial of his rule 3.850 motion. He also petitions this Court for a writ of habeas corpus.

RULE 3.850 APPEAL
Cummings-El's rule 3.850 appeal asserts the following: (1) the postconviction court erred by denying Cummings-El's claim that trial counsel was ineffective for failing to request a second-chair attorney; (2) the postconviction court erred by denying Cummings-El's claim that trial counsel was ineffective for failing to object to the State's method of death-qualifying a jury and for failing to object to the trial court's exclusion of venirepersons Kozakowski and Oshinsky for cause; (3) the postconviction court erred by denying Cummings-El's claim that trial counsel was ineffective for failing to object to an improper comment *250 made by the trial court regarding Cummings-El's right to remain silent; (4) the postconviction court erred by denying Cummings-El's claim that trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase; (5) the postconviction court erred by denying Cummings-El's claim that trial counsel was ineffective for failing to call Daphne Roberts to testify during the penalty phase; (6) the postconviction court erred by denying Cummings-El's claim that trial counsel was ineffective for failing to object to the cumulative testimony of Michael and Daisy Adams at the penalty phase; and (7) the postconviction court erred by denying Cummings-El's claim that the cumulative effect of trial counsel's errors resulted in ineffective assistance of counsel. In view of the thorough and well-prepared order of the trial court, we find it unnecessary to discuss each of Cummings-El's claims and affirm the postconviction court's summary denial of claims one, two, three, five, six, and seven.[6] We will discuss Cummings-El's fourth claim that trial counsel was ineffective for failing to investigate and present mitigating evidence at the penalty phase of trial.
In Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court provided the guidelines for establishing an ineffective assistance of counsel claim:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown of the adversary process that renders the result unreliable.
This Court reviews a postconviction court's Strickland analysis as follows:
[T]he performance and prejudice prongs are mixed questions of law and fact subject to a de novo review standard but... the trial court's factual findings are to be given deference. See Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999). So long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court. Id. We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact.
Porter v. State, 788 So.2d 917, 923 (Fla. 2001).
With respect to claims of ineffective assistance of counsel for failing to investigate and present evidence at the penalty phase, the United States Supreme Court recently provided:
[O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence... was itself reasonable. In assessing counsel's investigation, we must *251 conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."
Wiggins v. Smith, ___ U.S.___, ___, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) (citations omitted).
During the penalty phase of this case, trial counsel Theodore Mastos presented the testimony of two of Cummings-El's sisters, Catherine Covington and Diane St. Fleur. They testified that Cummings-El was good to his family, was not violent, and was innocent of the crime. Cummings-El argues that Mastos should have conducted a more thorough investigation to determine whether there was additional mitigating evidence relating to his personal history and to his mental health.
The postconviction court held a six-day evidentiary hearing on this issue. During the hearing, Cummings-El presented testimony from six family members, his middle school principal, his girlfriend, and a childhood friend. These witnesses generally testified as to Cummings-El's family, upbringing, relationship with his children, personal character, work history, and past drug and alcohol use. Cummings-El also presented three mental health experts who testified regarding Cummings-El's mental state at the time of the crime and whether he suffered from brain damage.
Dr. Lynn Schram, a clinical neuropsychologist, testified that the only case in which he had been qualified to testify as a neuropsychologist was a civil case and that he was not an expert on legal issues. Dr. Schram then testified regarding the tests that he performed on Cummings-El. Dr. Schram concluded that Cummings-El suffers from an attention/concentration problem that could be indicative of some organic brain damage. Dr. Schram further testified that he could not diagnose brain damage with certainty, nor could he find that Cummings-El was impaired in his everyday functioning.
Dr. Merry Haber, a forensic psychologist, testified that she was asked to evaluate Cummings-El and develop a psychosocial history to determine whether there were any mitigating factors that would affect Cummings-El's death sentence. Dr. Haber concluded that Cummings-El suffers from antisocial personality disorder and exhibits features of obsessive compulsive personality disorder, both arising from his poor upbringing. Dr. Haber stated that she believed that Cummings-El knew his conduct was wrong and that she could not diagnose brain damage with certainty.
Lastly, Dr. Bruce Frumkin, a forensic clinical psychologist, testified regarding his evaluation of Cummings-El. Dr. Frumkin concluded that Cummings-El did not suffer from antisocial personality disorder, but rather, Cummings-El suffered from depression, polysubstance abuse, and cognitive inflexibility or "tunnel vision" that could be caused by some organic brain damage. Dr. Frumkin further testified that Cummings-El's attention impairment could be caused by something other than a neurological impairment.
In response, the State presented the testimony of Dr. John Spencer, a clinical forensic psychologist, and Dr. Jane Ansley, a neuropsychologist. Dr. Spencer testified that his evaluations of Cummings-El revealed no significant brain damage or gross cognitive impairments. He concluded that Cummings-El had antisocial personality disorder. Dr. Spencer also used a video interview of Cummings-El to reveal Cummings-El's ability to adapt his behavior to changing situations, contradicting a *252 diagnosis that Cummings-El experienced "tunnel vision."
Dr. Ansley testified that her review of Cummings-El's medical history, the raw data obtained by the other experts in this case, and the results of the tests she administered to Cummings-El indicated that Cummings-El had no organic brain damage or executive function deficit. Dr. Ansley concluded that Cummings-El has antisocial personality disorder. She further testified that she disagreed with Dr. Schram's conclusion that Cummings-El experienced an attention/concentration deficit and that she believed that Cummings-El's executive functioning was intact.
The State also presented the testimony of Theodore Mastos, Cummings-El's trial counsel. Mastos testified regarding his career as an attorney and his experience handling capital cases. Mastos testified that Cummings-El was adamant about not wanting his family to "beg for his life" because Cummings-El believed he would be found innocent. Mastos became concerned about Cummings-El's refusal to provide information and witnesses, and sought to ensure that Cummings-El's refusal was knowing and intelligent. Mastos therefore requested that Cummings-El be evaluated. Dr. Sanford Jacobson evaluated Cummings-El and concluded that he was indeed competent to make the decision to waive a mitigation defense, he suffered from no mental illness, and he understood the nature and consequences of his decision not to present mitigating evidence.
Mastos testified that, given his client's wishes during the penalty phase, his strategy was to present Cummings-El in a positive light. Mastos therefore did not present evidence of Cummings-El's drug use, poor upbringing, or that he came from a family whose members had substantial criminal charges and convictions, because he believed that such evidence would have an adverse effect on the jury. Mastos further stated that had he determined that Cummings-El suffered from antisocial personality disorder, he would not have presented that fact to the jury because to do so would have been inconsistent with his strategy. Mastos had remained successful in keeping out the details of Cummings-El's prior convictions.
In its detailed order denying relief on this issue,[7] the postconviction court found that Mastos's strategy to present positive aspects of Cummings-El's personality and to prevent negative evidence from being introduced was reasonable, particularly in light of the fact that Cummings-El made it extremely difficult for Mastos to obtain mitigating evidence. The court further found that the testimony of Cummings-El's friends and family members presented at the evidentiary hearing was essentially the same as the evidence presented at the penalty phase. Moreover, the court noted that if Mastos had presented this additional testimony, it would have opened the door to extremely damaging testimony about Cummings-El on cross-examination. See Breedlove v. State, 692 So.2d 874, 877-78 (Fla.1997) (holding that trial counsel was not ineffective for failing to present testimony of friends and family members that would have been subject to cross-examination that would have countered any value defendant might have gained from favorable evidence).
The court evaluated the mental health expert testimony as follows:
This Court found the video tape of the interview of Dr. Spencer and the Defendant very helpful. The Court observed first hand how the Defendant *253 has the ability to change his behavior as the situation changed. Additionally, the testimony of Dr. Ansley was extremely credible. Dr. Ansley had the benefit of the work of the other experts, and took it another step. Dr. Ansley concluded that the Defendant does not suffer from organic brain damage. While Dr. Schram concluded that the Defendant may have brain damage, he is a neuro-psychologist, not a forensic neuropsychologist. Dr. Schram has very little experience in the area of forensic cases. Dr. Ansley, on the other hand, is a forensic neuro-psychologist with vast experience, having worked on several hundred forensic cases. Due to her experience and expertise in the forensic neuropsychology field, and the thoroughness of her work in this case, this Court finds her testimony to be extremely credible.
The postconviction court therefore concluded that Cummings-El had not met his burden of proving that trial counsel's conduct at the penalty phase was deficient. The court further stated that it was "confident in the outcome of the penalty phase, as [Cummings-El] has failed to show that even if counsel's assistance was ineffective, that there was a reasonable probability that but for the errors complained of, the result would have been different."
We find that the factual findings described above are supported by competent, substantial evidence. Applying the law to these facts, we find no error in the postconviction court's denial of relief based upon that court's detailed evaluation of the evidence. Cummings-El has failed to establish that the outcome of his case would have been different had trial counsel presented the proposed mitigating evidence.

PETITION FOR WRIT OF HABEAS CORPUS
In his petition for writ of habeas corpus, Cummings-El asserts: (1) appellate counsel was ineffective for failing to argue that the trial court committed fundamental error by allowing prejudicial testimony and prosecutorial misconduct; (2) appellate counsel was ineffective for failing to ensure proper preparation of the record on appeal; and (3) Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), renders Florida's capital sentencing scheme unconstitutional.

Habeas Issue 1:

Prejudicial Testimony and Prosecutorial Misconduct
Cummings-El contends that his appellate counsel was ineffective for failing to raise on direct appeal the claims that the trial court committed fundamental error by allowing the introduction of prejudicial testimony and by allowing improper prosecutorial comments during the penalty phase. When evaluating an ineffective assistance of appellate counsel claim raised in a writ of habeas corpus, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). The defendant must allege a specific, serious omission or overt act upon which the claim of ineffective assistance can be based. Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). In the absence of fundamental error, an appellate attorney has no obligation to raise an issue that was not preserved for review. *254 Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000). Fundamental error is error that "reaches down into the validity of the trial itself to the extent that the verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla.1996). We find that Cummings-El's appellate counsel was not ineffective for failing to raise the unpreserved claims regarding witness testimony and prosecutorial comments because no fundamental error occurred.
Cummings-El's first subclaim involves the penalty-phase testimony of Michael and Daisy Adams. Cummings-El contends that this testimony was cumulative and unduly prejudicial. The record reveals, however, that the witnesses' testimony at these stages was wholly unrelated. During the guilt phase, these witnesses testified with respect to the incidents surrounding the victim's death and the victim's identification of Cummings-El as the perpetrator. During the penalty phase, these witnesses testified regarding the victim's consciousness and awareness of her impending death. The witnesses' testimony at the guilt and penalty phases was therefore not cumulative or unduly prejudicial but was directly relevant to the facts at issue in each separate phase.
In his second subclaim, Cummings-El contends that appellate counsel was ineffective for failing to assert that the trial court committed fundamental error by allowing the prosecutor to (1) comment on nonstatutory aggravation; (2) suggest that there were matters outside the record that the trial court could consider in determining the ultimate sentence; (3) bolster the weight of the State's evidence by arguing that the trial court had already sanctioned the existence of the felony murder aggravator; (4) argue future dangerousness; and (5) work to inflame the passions of the jury by inviting it to imagine the victim's pain and suffering as it acted out the victim's last moments of life. We find that the record does not support Cummings-El's assertions with regard to these claims. The record instead reveals that the prosecutor's statements did not give rise to any of the errors listed above. Cummings-El has therefore failed to establish fundamental error with regard to these claims.

Habeas Issue 2:

Proper Preparation of the Record
Cummings-El claims that appellate counsel was ineffective for failing to include in the record a hearing during which the trial court addressed whether appointed trial counsel was ineffective. He asserts that in that hearing, the trial court failed to conduct an adequate inquiry into Cummings-El's claims of ineffective assistance of trial counsel, failed to rule on the motion as required by Hardwick v. State, 521 So.2d 1071, 1074-75 (Fla.1988), and failed to inform Cummings-El of his right to self-representation. This Court addressed a trial court's obligation regarding claims of incompetent counsel in Morrison v. State, 818 So.2d 432, 440 (Fla. 2002):
In Hardwick v. State, 521 So.2d 1071 (Fla.1988), this Court adopted the procedure announced in Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), to be followed when a defendant complains that his appointed counsel is incompetent. When this occurs, the trial judge is required to make a sufficient inquiry of the defendant to determine whether or not appointed counsel is rendering effective assistance to the defendant. See Howell v. State, 707 So.2d 674, 680 (Fla. 1998). However, as a practical matter, the trial judge's inquiry can only be *255 as specific as the defendant's complaint. See Lowe v. State, 650 So.2d 969 (Fla. 1994). This Court has consistently found a Nelson hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made. See Davis v. State, 703 So.2d 1055, 1058-59 (Fla.1997); Gudinas v. State, 693 So.2d 953, 962 n. 12 (Fla.1997); Branch v. State, 685 So.2d 1250, 1252 (Fla.1996). Similarly, a trial court does not err in failing to conduct a Nelson inquiry where the defendant merely expresses dissatisfaction with his attorney. See Davis, 703 So.2d at 1058-59; Branch, 685 So.2d at 1252; Dunn v. State, 730 So.2d 309, 311-12 (Fla. 4th DCA 1999).
A review of the transcript from the January 4, 1993, hearing reveals that although Cummings-El made general allegations of dissatisfaction, he did not make an express allegation of attorney incompetence. The trial court asked Cummings-El why he believed his trial counsel should be removed from the case. Cummings-El responded only that he believed trial counsel was siding with the prosecution in trying to persuade him to accept a plea and that trial counsel was not meeting with him on a regular basis.
The record reveals that the trial court indeed specifically inquired into Cummings-El's claims and, based on Cummings-El's responses, concluded that there was no need for the court to conduct a separate hearing on this claim. We find that the record supports the trial court's findings in this regard and that Cummings-El's general allegations did not establish a sufficient basis to compel the trial court to hold a hearing to determine attorney competence. Morrison, 818 So.2d at 440. Accordingly, Cummings-El has not established that appellate counsel erred by failing to include the transcript of the hearing on appeal. Appellate counsel cannot be ineffective for failing to raise a claim that would have been rejected on appeal. Lambrix v. Singletary, 641 So.2d 847, 848-49 (Fla.1994).

Habeas Issue 3:

Ring v. Arizona
Cummings-El asserts that his death sentence is unconstitutional in light of the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We have denied relief for postconviction claims based upon this argument. See Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). We likewise deny Cummings-El's claim.

CONCLUSION
Accordingly, we affirm the trial court's denial of Cummings-El's rule 3.850 motion and deny Cummings-El's petition for writ of habeas corpus.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs specially with an opinion.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
PARIENTE, J., specially concurring.
As in previous postconviction appeals, I write separately to specify that my concurrence in the denial of relief under Ring rests solely on the existence of a prior violent felony aggravating circumstance. See Cole v. State, 841 So.2d 409, 431 (Fla. *256 2003) (Pariente, J., concurring in result only); Fotopoulos v. State, 838 So.2d 1122, 1136-37 (Fla.2002) (Pariente, J., concurring in result only); Bottoson v. Moore, 833 So.2d 693, 723 (Fla.) (Pariente, J., concurring in result only), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002). In Bottoson and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), on which the majority relies, we denied habeas relief to petitioners whose aggravating circumstances included prior violent felony convictions, but did not issue a majority opinion in either case reflecting a consensus on the rationale for the result. Subsequently, this Court has issued majority opinions referring to the aggravator of previous conviction of a violent felony as grounds for the rejection of Ring claims in numerous cases including, most recently, Jones v. State, 855 So.2d 611, 619 (Fla. 2003). The majority in Jones relied on my concurrence in Bottoson to support its conclusion that the prior violent felony aggravator is "a factor which under Apprendi and Ring need not be found by the jury." Id. Thus, although there remains no consensus on the effect of Ring on Florida's capital sentencing scheme, it appears that a majority of the members of this Court have concluded that the prior violent felony conviction aggravator alone is a sufficient reason to deny relief under Ring.
I agree that in this case, Cummings-El does not have a valid Ring claim, but only because of the prior-conviction aggravator and not on any other basis.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects except for its discussion of the impact of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on Florida law.
APPENDIX I

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CRIMINAL DIVISION
Case No. F91-33268
STATE OF FLORIDA
Plaintiff,
vs.
F.W. CUMMINGS-EL
Defendant.

ORDER DENYING AMENDED MOTION TO VACATE JUDGMENT OF CONVICTION AND SENTENCE OF DEATH AND FOR OTHER APPROPRIATE RELIEF IN PART AND GRANTING EVIDENTIARY HEARING ON CLAIM V
This cause having come before the Court on Defendant's Amended Motion to Vacate Judgment of Conviction and Sentence of Death and for Other Appropriate Relief, and the Court having reviewed the Motion, the Response filed by the State, and having held a Huff Hearing on July 23, 1999, finds as follows:
CLAIM I: In Claim I of his Motion, Defendant argues that counsel was ineffective for failing to preserve for appellate review the action of the Court in striking for cause two members of the jury panel who favored life in prison over the death penalty. The U.S. Supreme Court has held in Lockhart v. McCree, [476 U.S. 162] 106 S.Ct. 1758 [90 L.Ed.2d 137] (1986), that the Constitution does not prohibit removal for cause, prior to the guilt phase of a bifurcated capital case, prospective jurors whose opposition to the death penalty is so *257 strong that it would prevent or substantially impair performance of their duties as jurors at the sentencing phase of the trial.
Similarly, in Buchanan v. Kentucky, [483 U.S. 402] 107 S.Ct. 2906 [97 L.Ed.2d 336] (1987), the U.S. Supreme Court held that "Death qualification" of a capital jury, whereby prospective jurors were excluded for cause in light of their stated inability to set aside their strong opposition to the death penalty, did not violate defendant's right to a jury selected from a representative cross section of the community. The Court noted that not all who oppose the death penalty are excludable for cause. Those who indicate that they can set aside temporarily their personal beliefs in defense to the rule of law may serve as jurors. Id., at 2914.
The record reflects that the jurors were stricken after saying that they could not set aside their beliefs and follow the law, these portions of the record are attached to this order hereto as Exhibit "A".
Accordingly, no evidentiary hearing is necessary on this Claim.
CLAIM II: In Claim II Defendant alleges that counsel was ineffective in failing to call Daphne Roberts as a witness. Defendant has failed to demonstrate prejudice pursuant to Strickland v. Washington, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984). The testimony of the victim's son, mother, and cousin refute the allegations of this claim overwhelmingly, as specifically detailed in the State's Response to Amended Motion to Vacate Conviction and Judgment and Sentence of Death.. In her deposition, Daphne Roberts stated that the victim said "He hurt me, he hurt me, Mama. Fred hurt me." When asked did Kathy say "Fred", she replied "Yes, she did." See Deposition of Daphne Roberts, p. 19, attached hereto as Exhibit "B".
CLAIM III: In Claim III the Defendant argues that counsel was ineffective in failing to have the jury make separate findings on their verdict or verdicts at the guilt/innocence phase with respect to the prosecution's claim. In Brown v. State, 473 So.2d 1260 (Fla.1985), the Court held that it was proper for the trial court to refuse the use of special verdict forms which would have indicated whether first-degree murder conviction was based upon premeditated or felony-murder.
In Buford v. State, 492 So.2d 355 (Fla. 1986), Buford's argument was that in light of various theories of first-degree murder presented to the jury, a special verdict form was required to insure that the jury did not convict him under a theory and factual setting which would prohibit the imposition of the death penalty. The Court held that a special verdict form is not required to determine whether a defendant's first-degree murder conviction is based upon premeditated murder, felony murder or accomplice liability. Id., at 358.
Further, counsel is not ineffective for failure to anticipate changes in the law. Muhammad v. State, 426 So.2d [533] 538 (Fla.1983); Harvey v. Dugger, 656 So.2d [1253] 1258 (Fla.1995).
Additionally, this claim should have been raised on appeal and is procedurally barred. Maharaj v. State, 684 So.2d 726, 728 (Fla.1996).
CLAIM IV: Claim IV is that counsel was ineffective in failing to object to a statement made by the Court to the jury about failure to put on a defense. This issue was raised on appeal but not addressed by the Supreme Court as it was not properly preserved.
The record refutes prejudice to the Defendant. The Court's instruction, in context, states: *258 Folks, the only side of this case who has to go forward and prove anything is the State side. The Defense does not have to prove anything. The burden of proof of coming forward with the evidence, of coming up with witnesses, coming forward with the exhibits, all that.
The Defense is not required to prove anything. They're not required to disprove anything and that burden of proof of coming forward with the evidence is beyond and to the exclusion of every reasonable doubt. So that would not be a requirement. I just want to make sure everybody understands for the defendant to prove he had a twin, bring to you the evidence.
It's possible that the Defense does not utter a word through he trial. Although it wouldn't happen. It shouldn't happen. We need to try to get on, if we can but go ahead.
Transcript, pp. 247-248, attached hereto as Exhibit "C".
This claim is refuted by the record and barred.
CLAIM V: This claim alleges that counsel was ineffective in that he failed to properly and adequately investigate and prepare mitigating evidence. Defendant has failed to state what the mitigating evidence would be and how he suffered prejudice as a result. A defendant my not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing. Kennedy v. State, 547 So.2d 912 (Fla.1989). See also Engle v. Dugger, 576 So.2d 696, 700 (Fla.1991); Valle v. State, 705 So.2d 1331, 1334 (Fla.1997); Teffeteller v. Dugger, 24 Fla. L. Weekly S110, 114 (March 1999).
There are some indications that the Defendant did not want to cooperate in the mitigation stage. Defendant was evaluated by Dr. Sanford Jacobson on January 5, 1993. The defendant told Dr. Jacobson "he did not want family members to testify in his behavior." See report of Dr. Jacobson, attached as Exhibit "D". When asked to explain, the Defendant told Dr. Jacobson there was no difference to him between life in prison or the death sentence because if he was in jail for the rest of his life, he was lost to his family.
In an abundance of caution, this Court will conduct a evidentiary hearing to determine if trial counsel was ineffective in failing to present mitigating evidence during the penalty phase.
CLAIMS VI & VII: These claims allege incorrect application of the C.C.P. and H.A.C. aggravating factors. They were raised on appeal and are barred. Maharaj v. State, 684 So.2d 726, 728 (Fla.1996). Matters pertaining to the use of aggravating factors to be used in the sentencing phase of a capital crime are procedurally barred because they could have or should have been raised on direct appeal. Engle v. Dugger, 576 so.2d 696, 703 (Fla.1993); Lopez v. Singletary, 634 So.2d 1054, 1056 (Fla.1994); Henderson v. Dugger, 522 So.2d 835, 838 n.(14).
CLAIM VIII: This claim alleges the Defendant was deprived of a fair trial because he only had one attorney. In Larkins v. State, 655 So.2d 95 (Fla.1995), the Supreme Court held that the trial court's refusal to appoint two attorneys in a capital murder trial was not ineffective assistance of counsel and did not deprive Defendant of due process. See also Armstrong v. State, 642 So.2d 730 (Fla.1994). Furthermore, this claim should have been raised on direct appeal and is barred.
CLAIM IX: This claim is that defendant was deprived of a fair trial. It should have *259 been raised on appeal and is barred. Maharaj v. State, 684 So.2d 726 (Fla.1996).
CLAIM X: This claim is that the trial court incorrectly commented about the Defendant stating that he wanted to be sentenced to death. The jury voted eight to four in favor of death and the jury did not hear this comment. This claim should have been raised on appeal and is barred. Maharaj v. State, 684 So.2d 726 (Fla.1996).
CLAIM XI: This claim is that the death penalty is per se unconstitutional. This issue should have been raised on appeal and is barred. Woods v. State, 531 So.2d 79 (Fla. 1988). Additionally, the Supreme Court has again recently held that the death penalty is not cruel and unusual punishment. Provenzano v. State, [739 So.2d 1150] 24 Fla. L. Weekly S314 (July 1, 1999); Jones v. State, 701 So.2d 76 (Fla.1997).
Currently the usage of the electric chair is being challenged by Thomas Provenzano in front of Judge Clarence Thomas in Orlando. In the event the electric chair is found by the Florida Supreme Court to be cruel and unusual punishment and lethal injection is not an option, this Court will entertain a renewed motion on this ground.
WHEREFORE, it is ORDERED AND ADJUDGED that Defendant's Amended Motion for Postconviction Relief is DENIED as to Claims I, II, III, IV, VI, VII, VIII, IX, X, and XI. An Evidentiary Hearing On Claim V will be held on Friday, September 17, 1999 and 2:00 p.m.
DONE AND ORDERED in Miami-Dade County this 29th day of July, 1999.
/s/ ________________
Joseph P. Farina
Circuit Court Judge
Exhibit "A" Re: Juror Oshinsky
MR. HONIG: That's only life in prison, with a twenty-five year minimum mandatory.
MR. YERO: Life in prison would have to be one hundred years, so I know the person will rot in jail.
MR. HONIG: Because we can't do it. Today it's death or life with a twenty-five year minimum mandatory.
MR. YERO: No matter.
MR. HONIG: No matter what we show you?
MR. YERO: I don't think so.
MR. HONIG: Okay. I appreciate that.
How about Mr. Lopez, Dr. Lopez' row, Mr. Oshinsky?
MR. OSHINSKY: In response to the Judges question, before I indicated that I thought, not withstanding my belief, that I could follow the law. Posing it the way you posed it and perhaps that enlightens what happens in the second phase, that gives me some pause and if it's strictly a recommendation that comes from my belief in the entire content, than I would have to tell you that my recommendation would have to be at best life in prison on a finding of guilty. And whether or not there is some circumstances that would push me beyond that, I can't imagine what that is, but I can't say that that couldn't be presented.
MR. HONIG: So you're feeling already that if the defendant would be found guilty, you most likely vote life in prison; is that a fair summary?
MR. OSHINSKY: It's a fair summary.
MR. HONIG: I'm going to try to, if we get to the second phase, if we get to the question of the death penalty, you're already leaning one way, was that fair?
MR. OSHINSKY: Uh-huh.
*260 MR. HONIG: If we have to prove to you that death is the appropriate punishment, are you going to make us prove it by a burden of proof higher than reasonable doubt because you have such strong feelings?
MR. OSHINSKY: I'm not sure what the tests are. That is, I don't practice criminal law as the other laws. I'm not sure what is your proof or what the standard of law is to permit or recommend for the death penalty.
MR. HONIG: We'll get to that in a moment.
MR. MASTOS: Judge, most respectfully, there will be the standard under the Statute 921, the aggravating and mitigating circumstances so the jury will not be confused.
THE COURT: I could do it in a very general way. The legislature has given us some help when we have to try to make this decision. In part, that is assuming to begin with that a jury has agreed by unanimous vote that somebody is guilty of first degree murder. In the statutes of Florida, there is a list of things that jurors can consider, can weigh, can balance, in helping them to decide in Phase II whether or not death penalty is appropriate in a particular case.
They actually spell things out. You could consider this. You could consider that. In terms of saying yes, the death penalty would be applicable or maybe no, it wouldn't be for various reasons. So, you will have factors to consider. They are called aggravating circumstances. They're also called mitigating circumstances. I really don't want to get into all of them now because a jury could consider things not even on the list. When it comes to mitigating factors, there is a balance. All twelve of you will be able to express your opinions and cast your vote individually. You don't have to come up with a unanimous verdict. On Phase II, the Judge will want to hear by your vote, are you in favor by a vote of zero to twelve. It's a lot of balance, give and take.
MR. HONIG: I want to finish up the line. I think I was still in Lopez' row. Is there anybody in this row? We've already talked to people, given a choice, they will always recommend life in prison. One of the things you said Ms. Rosenthal was if I saw the crime and was one hundred percent sureis there any other way if you didn't see the crime, but were one hundred percent sure?
MS. ROSENTHAL: How could I be one hundred percent sure?
MR. HONIG: So you couldn't do it?
MS. ROSENTHAL: No.
MR. HONIG: How about the third row, was life in prison
MS. GRUBB: Me.
MR. HONIG: And that's Ms. Grubb. Is this a religious or moral feeling or you just can't make that choice yourself?
MS. GRUBB: I can't make it myself.
MR. HONIG: If the State proved to you that if there was ever a death penalty case that this is it, what would be your recommendation?
MS. GRUBB: Live in prison.
MR. HONIG: Is there any way we could change how you feel about that?
MS. GRUBB: No.
MR. HONIG: Anybody else in this row?
One of the things that came up with Mr. Oshinsky and Ms. Rosenthal, what do I have to prove to Ms. Rosenthal absolutely, unless she was there. I'm not sure I have to prove
*261 Exhibit "A" Re: Juror Kozakowski
MR. HONIG: There will be another trial. There's going to be witnesses and evidence. This is an issue of where you get to see, if sitting in this box or not or whether you get the burden of making a decision because as lawyers, we stand up here and hear ourselves talk and we want to make sure that we're getting a jury that will sit fairly in this case. Like I said, there are all kinds of cases. We want to make sure this is the right case for you.
Mr. Kozakowski, I made you a promise and I'm going to stick to it. I don't remember what I'm going to ask though. If you find the defendant guilty of first degree murder, you and eleven other people on the jury, when we get to the second part, are you already going to have your mind made up? What do you think you're going to do? Are you going to be able to listen and follow the law? It's like another trial. You have to start with a clean slate. Do you think you will be able to do that?
MR. KOZAKOWSKI: I'm afraid, in my own conscience, that I would go for the imprisonment rather than the death penalty.
MR. HONIG: If the Judge tells you, well, you can't. You have to clean it up and start from scratch. Could you do that or are you still going to be starting from one side to the other? You're still going to be starting, going towards imprisonment?
MR. KOZAKOWSKI: I'm very skeptical of the death penalty. I'll always agree I didn't hear the evidence or it's right or this wasn't enough evidence that would linger in my mind.
MR. FORT: I feel that there are people in prisons that should have gone to the chair or lethal injection or whatever. I feel there are people should have gone away to prison. There are people, we know, that plead mental insanity and usually they get off with just staying in prison. As far as voting, it's really not a vote. I guess it's a vote making my statement.
How I feel if the man has committed first degree murder, it could have been avoided, if the man could have avoided it and he didn't. I would say I would go along with the first degree murder. I mean, I would go along with execution in one way or the other later down the road.
MR. HONIG: Now, would you be able to sit if the defendant is convicted of first degree murder, will you be able to sit in the aggravating and the mitigating factors with a fair and open mind or would you already have your mind made up with the guilt?
MR. FORT: Once my mind is made up, it's going to stay there.
MR. HONIG: But would your mind be made up as to the guilt phase or could you keep that decision only?
MR. FORT: If he's guilty, he's guilty.
MR. HONIG: Ms. Pegram, if the defendant is found guilty, after that, you will be able to sit and listen to the mitigating factors and be able to or would your mind be
MS. PEGRAM: If he were declared guilty, I'll probably be thinking along the death penalty but, I would listen.
MR. HONIG: Mitigating
MS. PEGRAM: Things were, I would listen to that and it may have an effect on what I thought. I don't know.
MR. HONIG: Would you be able to follow the law that the Judge gives you that says you need to listen and watch and hear the evidence on this second trial and judge it on your own
MS. PEGRAM: I think so.
*262 MR. HONIG: How about you, Mr. Sanchez? These are all tough questions. They really are.
MR. SANCHEZ: If the accused is found guilty, I would say I would probably vote, if I'm truly convinced that the person committed the first degree murder, yes I will.

Exhibit "B"

DEPOSITION OF DAPHNEY ROBERTS
....
A. She just made it right there to the door.
Q. All right, did she actually get into the living room?
A. Yes.
Q. And
A. And she fell right there.
Q. All right, she collapsed?
A. She fell.
Q. And then what happened? Did somebody call the police?
A. First Mike, yeah. Mike grabbed her, and Miss Daisy, she just gotMiss Daisy just got hysterical and started screaming. Kathy was saying, "He hurt me, he hurt me, Mama. Fred hurt me." And Mike grabbed her.
Q. Now, did Kathy say "Fred"?
A. Yes, she did. "He hurt me, Mama, he hurt me." And Mike grabbed her, was holding her up like this (indicating), and Miss Daisy got hysterical.
She got on the phone, was calling the 911, and Mikeshe was on the phone, and Mike had her, and she was saying, "I can't breathe, I can't breathe." And it sounded like she had a cold or something. She was getting clogged up, I guess. She said, "I can't breathe, I can't breathe."

Exhibit "C"
MR. HONIG: What if her brother knows the guy?
MR. ROJAS: I think that helps.
MR. HONIG: How many people think that it's a reasonable doubt?
MR. SOFFIAN: Only if the defense case, if he says he has a twin brother.
MR. MASTOS: We will object and ask that the Court instruct that the Defense has no burden of proof and furthermore, I think Mr. Honig is arguing the case. I object.
THE COURT: Folks, the only side, the only side of this case who has to go forward and prove anything is the State side. The Defense does not have to prove anything. The burden of proof of coming forward with the evidence, of coming forward with the witnesses, coming forward with the exhibits, all that.
The Defense is not required to prove anything. They're not required to disprove anything and that burden of proof of coming forward with the evidence is beyond and to the exclusion of every reasonable doubt. So that would not be a requirement. I just want to make sure everybody understands for the defendant to prove that he had a twin, in order for the State to prove the case, they have to bring to you all the evidence.
It's possible that the Defense does not utter a word through the whole trial. Although it wouldn't happen. It shouldn't happen. We need to try to get on, if we can but go ahead.
MR. HONIG: Thank you.
I'll try to handle it very quickly. The Defense doesn't have to prove anything, but I'm asking sort of another side to that question. Do you think that speculation or *263 forced doubt, do you think it's a reasonable doubt?
MR. SOFFIAN: I think it's purely speculation. I wouldn't say it's reasonable.
MR. HONIG: What do you think?
MR. SOFFIAN: Speculation.
MR. HONIG: How many people here would label it that way, speculation? How many people would label it that way? How many people are tired of raising their hands?
MS. MICK: I don't understand the question.
MR. HONIG: Mr. Rojas said that a reasonable doubt might be even if you have, I've got an identification, possibility someone has a twin brother, I'm asking if it's a reasonable doubt or do you think that's creating an issue in your own doubt, speculating, a possibility out of your own head now, out of the evidence.

Exhibit "D"
UNIVERSITY OF MIAMI SCHOOL OF MEDICINE
Sanford Jacobson, M.D., U.M.D.C.
January 5,1993
The Honorable Joseph P. Farina, Circuit Court, Eleventh Judicial Circuit of Florida, 1351 N.W. 12 Street, Miami, Florida 33125
Re: Cummings EL, F.W.
Case No. 91-33268
Dear Judge Farina,
F.W. Cummings-EL, also known as Frederick Wooden, is a 34 year old black male seen for psychiatric evaluation at the Dade County Jail on January 5, 1993 in connection with charges of first degree murder and armed burglary. The defendant is seen to determine his competency for legal proceedings, his ability to meet the test for criminal responsibility, and his need for involuntary hospitalization and treatment. The evaluation was requested because some of the statements attributed to the defendant with respect to the sentencing phase of his trial if indeed the defendant were to be found not guilty.
HISTORY AND EXAMINATION. The defendant entered the interview situation willingly. I asked him about his name and he told me that the EL at the end of his name is an attribute that he had placed after his name dealing with his nationality. I did not inquire further. Later in the interview he explained that Cummings was his father's name and F.W. stands for Frederick Wooden. He noted that his father had been separated from his mother and he did not know him that well. His father is now deceased.
The defendant indicated that he was aware that an evaluation had been requested and explained that it had come about when he was being asked by his attorney, Mr. Mastos, about family members being available to testify at a sentencing phase in the event he were found guilty. The defendant stated he did not want family members to testify in his behavior. When asked to explain he told me that there was no difference between life imprisonment and a death sentence because if he was in jail for the rest of his life he was lost to his family. The defendant professed his innocence and stated that he did not kill the victim. According to the defendant he is totally innocent of the charges.
The defendant talked about the allegations and stated that they were not true. He complained about the fact that witnesses apparently first failed to identify him and later came forth and named him as the person that committed the offense. He also talked about the fact that there was no forced entry even though one was *264 claimed by one of the witnesses. He also added that there was no physical evidence that would implicate him.
Later in the interview the defendant acknowledged that he knew the victim and that she was a former girlfriend. He also acknowledged that some type of restraining order had been placed against him but that he had adhered to it and it was no problem for him. The defendant indicated that he has had a number of relationships with women. He claims that the victim was a girlfriend but that they had no children together although he has five children with whom he describes an active role in their upbringing.
The defendant was able to participate in an effective fashion in the interview. He was well organized in his thinking and expressed himself in a goal directed fashion. There were no hallucinations acknowledged in the past or present. Nothing was present to suggest delusional thinking. The defendant showed some slight irritability at the onset of the interview but that dissipated. Anxiety level was certainly within acceptable limits. Mood was not depressed. No obsessive or phobic symptoms were noted. With respect to substance abuse, the defendant stated that he has used alcohol and marijuana and also occasionally cocaine but denies any problem with these and states that he is not dependent on them and no longer abuses them. He indicated that the victim did use drugs to some degree although he did not describe her as a heavy user.
In terms of any previous psychiatric history, he denied both psychiatric consultation on an outpatient basis or any inpatient treatment. Past medical history was non-contributory and he disclaimed any operations or serious injuries.
With respect to his vocational history, he talked about working as a roofer and in construction. The defendant states he has a high school equivalency.
He talked about his family and noted that he was the 7th of 12 children. He described a good relationship with his mother and his siblings.
Testing of special faculties showed no impairment in terms of orientation, memory or intellectual functioning.
SUMMARY AND CONCLUSIONS. Presently it is felt that the defendant is competent for legal proceedings and has sufficient present ability to communicate with counsel with a reasonable degree of rational understanding. He possesses both a rational and factual understanding of the charges. An assessment of the various factors considered indicates that:
A. The defendant's appreciation of the charges is acceptable;
B. The defendant's appreciation of the range and nature of possible penalties is acceptable;
C. The defendant's understanding of the adversary nature of legal process is acceptable;
D. The defendant's capacity to disclose to attorney pertinent facts of the proceedings at issue is acceptable;
E. The defendant's ability to manifest appropriate courtroom behavior is acceptable;
F. The defendant's capacity to testify relevantly is acceptable.
At this time the defendant would not meet criteria for involuntary psychiatric hospitalization.
With respect to the issue of sanity, I would conclude that the defendant was in the absence of any specific information to the contrary, sane and able to meet the test for criminal responsibility.
*265 With respect to the defendant's feelings about family members testifying in any sentencing phase if it were necessary, I can only state that the defendant's explanation does not appear to me to be irrational or bizarre. It may not be in his best interest at this time but the defendant might, if necessary, alter that opinion or view.
I do not think individuals who make statements of this type, which appear to be somewhat less than in their best interest, should be viewed as necessarily impaired or dysfunctional mentally. It is not in my opinion a reflection of a major mental illness although it might reflect aspects of his personality which are not always operating to serve his best interest.
Yours very truly,
/s/
Sanford Jacobson, M.D.
Psychiatrist
SJ/ms

APPENDIX II

Claim No. 5

COUNSEL WAS INEFFECTIVE FOR FAILURE TO PROPERLY AND ADEQUATELY INVESTIGATE AND PREPARE STATUTORY AND NON-STATUTORY MITIGATING EVIDENCE AT THE PENALTY PHASE.
After reviewing the record and carefully considering the testimony adduced at the evidentiary hearing, this Court does not feel the Defendant has met his burden of proving that trial counsel's conduct at the penalty phase amounted to deficient representation in light of Defendant's refusal to assist counsel in preparing for a penalty phase by expressly prohibiting counsel from presenting background evidence, irrespective of his later cursory consent to family members being contacted. Moreover, this Court is confident in the outcome of the penalty phase, as Defendant has failed to show that even if counsel's assistance was ineffective, that there was a reasonable probability that but for the errors complained of, the result would have been different.
Defendant claims that counsel was ineffective for failing to investigate whether there was available evidence to contend for the applicability of mental health mitigating evidence, family related, and other types of mitigating evidence. In order to prevail on this claim, Defendant must demonstrate that counsel's performance was deficient and that counsel's performance affected the outcome of the sentencing proceedings. Strickland at 695 [104 S.Ct. 2052]. Because the reasonableness of counsel's acts (including what investigations are reasonable) depends "critically" upon "information supplied by the [petitioner]" or "the [petitioner]'s own statements or actions," evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. Strickland, 104 S.Ct. at 2066. "[An] inquiry into counsel's conversations with the [petitioner] may be critical to a proper assessment of counsel's investigative decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Id. ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). Chandler, 218 F.3d at 1318, 1319.
During the Evidentiary Hearing, on December 20, 2000, Theodore Mastos, defendant's trial attorney testified before this court. Mr. Mastos is a former State Attorney, and a former County and Circuit Court Judge. After leaving the bench, *266 Mr. Mastos became a criminal defense attorney. As a defense attorney, Mr. Mastos tried one capital case prior to Defendant's, State v. Darvy & Harris. Both defendants in that case were acquitted. As a Circuit Court Judge, Mr. Mastos presided over the trials of Burley Gilliam and Jesus Scull, both of whom were convicted and sentenced to death.
Mr. Mastos testified that the State had a strong case against the Defendant. The State's witnesses were family members of the victim who knew the Defendant personally. Mr. Mastos testified that his defense strategy was mistaken identity and that this was not the type of crime the Defendant would have committed because interactions with the victim had been confrontational prior to the murder, and that this type of murder was committed by a coward. Mr. Mastos testified that no other defense was presented because the Defendant did not agree to any other defense. Mr. Mastos felt he would lose the trust of his client if he went against his wishes and proceeded to craft any other strategy.
Defendant argues that trial counsel was ineffective for failure to call family members to testify. Mr. Mastos testified he was familiar with the aggravators and mitigators. He testified that the Defendant nor his family members gave him any information that would have been useful in presenting evidence of statutory mitigating factors. He stated that the Defendant was quite strong-willed and he could not convince him to do anything. Mr. Mastos testified that the Defendant did not want him to contact his family members to testify on his behalf, that he did not want his family "begging for his life" because he was innocent. (TR. December 20, pp. 44,47, 49). Mr. Mastos testified that he became concerned about Defendant's refusal to provide information and witnesses and to ensure that the refusal was a knowing and intelligent decision, rather than the result of some unknown mental illness, he requested an evaluation by Dr. Sanford Jacobson. The report of Dr. Jacobson is Exhibit C to this Court's July 29, 1999 order. Dr. Jacobson found the Defendant competent to make the decision to waive a mitigation defense. The Court notes that no absolute duty exists to introduce mitigating or character evidence. Chandler at 1319.
Mr. Mastos further testified that Defendant grudgingly permitted trial counsel to contact family members, but maintained the position that he did not want them to beg for his life. The record shows that at the January 4, 1993 trial hearing Defendant gave trial counsel permission to speak to his family members, but Dr. Jacobson's report dated January 5, 1993 demonstrates that Defendant did not want family members to testify. However, during the penalty phase trial counsel presented testimony from the Defendant's two (2) available family members, to put a human spin on the case. Some of the Defendant's children were in court during the penalty phase, but did not wish to testify, nor did Defendant wish them to testify. This Court notes that trial counsel is not deficient for failure to present testimony from reluctant family members, Ferguson v. State, 593 So.2d 508, 510 (Fla.1992), nor is counsel ineffective for following the instructions of the Defendant.
At the evidentiary hearing, the Court heard testimony from the Defendant's sister, Catherine Covington, his niece, Catherine Wooden, his middle school principal, Moses Poole, the mother of four of Defendant' s children, Deborah Dawson, his sons Frederick and Lyndon Dawson, his nephew, Gregory Wooden, and a childhood friend of Defendant, Eddie Webster. The Court notes that the testimony of Catherine *267 Covington, Catherine Wooden, Frederick Dawson, and Deborah Dawson offered essentially the same non-statutory mitigation evidence as that presented at trial by the Defendant's two sisters. Mr. Mastos testified that he did not call the mother of four of Defendant's children, Deborah Dawson, who lived in another state because, according to Mr. Mastos, her testimony, like that of other civilian witnesses, would not have been particularly helpful to Defendant. Her testimony would have revealed, during cross-examination, that the Defendant was a drug user, supported her periodically, when he was not incarcerated, and voluntarily left her and the children when he moved back to Florida.
Defendant further argues ineffective assistance for trial counsel's failure to introduce mitigation evidence including the extensive history of criminal conduct of Defendant's siblings, and Defendant's substance abuse. Mr. Mastos was successful in keeping out details of Defendant's prior convictions. Mr. Mastos testified that he did not present the Defendant's previous incarceration records because he did not want the jury to think that Defendant was a career criminal, as this would not have elicited their sympathy. Moreover, while there are indicia of good behavior in the records, there are also notations of involvement in violent fights while incarcerated. The testimony by the family members at the evidentiary hearing would have exposed the jury to parts of the Defendant's criminal record that were not presented at trial. Mr. Mastos also testified that he would not have presented to the jury the criminal history of Defendant's family members as that would have resulted in the jury voting 10-2 or 12-0 for death, rather than 8-4. (TR. December 20, 2000, p. 100-101). Trial counsel is not ineffective for failing to present background information which would have allowed the presentation of damaging or derogatory evidence, including violent tendencies, in rebuttal. Breedlove v. State, 692 So.2d 874, 878 (Fla.1997); Medina v. State, 573 So.2d 293, 298 (Fla.1990).
Regarding Defendant's drug use, Eddie Webster testified about the Defendant's drug use. Moses Poole testified that in seventh, eighth, and ninth grades he had never observed the Defendant under the influence of drugs, and that the Defendant was an average student and was not a discipline problem. Mr. Mastos testified that the Defendant did not tell him about the drug use until after the trial was over. Counsel acknowledged that drug abuse can have a double-edged sword effect on the jury, as juries are not sympathetic to junkies generally. Further he believed that drug abuse testimony would have been helpful if the Defendant had claimed to have committed the crime while in a cocaine rage. Because the defense's strategy was to convince the jury that the Defendant was not present at the scene of the crime and did not commit the crime, and that Defendant is a decent, upstanding, family man, testimony of drug abuse at the penalty phase would not have been supportive of counsel's efforts. Counsel's strategic decisions will not be second-guessed on collateral attack. Johnson v. State, 769 So.2d 990, 1002 (Fla.2000) (tactical decision not to present a defense of voluntary intoxication does not constitute ineffective assistance); Remeta v. Dugger, 622 So.2d 452, 455 (Fla.1993).
Mr. Mastos said he would not have used extreme emotional disturbance as a mitigator as it was not consistent with the defense strategy. He also would not have presented a claim of impairment to Defendant's ability to conform his conduct to the *268 requirements of law as it, too, was inconsistent with the defense of mistaken identity. Mr. Mastos testified he would never have presented evidence that showed that the Defendant had an anti-social personality disorder or depicting Defendant as a psychopathic manipulator as that would defeat his goal of presenting Defendant as a normal human being, and would have a negative effect on the jury.
As to Defendant's claim of mental health mitigating factors, the record reflects that trial counsel did have Defendant psychologically evaluated prior to the guilt phase. See Report of Dr. Jacobson, dated January 5, 1993. Dr. Jacobson's report found Defendant's reasoning to be rational and not indicative of any mental illness. Id. at 3-4. Mr. Mastos testified that he did not request further mental health evaluations because Dr. Jacobson's report found nothing wrong and raised no red flags suggesting organic brain damage, nor did his interactions with Defendant reveal any psychiatric difficulties.
During the Evidentiary Hearing, the Court heard extensive testimony from five expert witnesses who conducted mental health evaluations of the Defendant for the purpose of determining the existence of mitigating factors. The three experts presented by the defense were psychologist Dr. Merry Haber, Dr. Bruce Frumpkin, a forensic and clinical psychologist, and Dr. Lynn Schram, a neuro-psychologist. The State presented Dr. John Spencer, a forensic and clinical psychologist and Dr. Jane Ansley, a clinical psychologist and forensic neuro-psychologist. The consensus of the expert testimony is that Defendant has an antisocial personality disorder, which is not a mitigating factor. They all agree that antisocial personality disorder does not cause criminal behavior, it explains it.
Dr. Haber testified that the Defendant has obsessive compulsive personality traits and has a tendency to focus on a certain issue and is unwilling or unable to change his focus. She also found that he is manipulative and likes to present himself in the best light and likes to convey the impression that he is an upright moral kind of guy. Dr. Haber also testified that Defendant had the capacity to know what he was doing when he killed the victim. She determined that he acts without impulse control. She was concerned about the possibility of brain damage due to the Defendant suffering a head injury as a child and while in prison, even though he did not lose consciousness during either incident. Additionally, she acknowledged that huffing gasoline could cause brain damage. As she is not a neuro-psychologist, she could not diagnose brain damage with certainty.
Dr. Frumpkin also testified about the Defendant's social history and head injuries. In addition to having an anti-social personality disorder, Dr. Frumpkin concluded that the Defendant is probably long-term chronically depressed. He agreed with Dr. Schram's conclusion that the Defendant cannot shift attention. On cross-examination, Dr. Frumpkin admitted that the impairment in Defendant's attention may not be due to improper brain functioning.
Dr. Schram, whose background does not include extensive experience in forensics nor familiarity with the legal standards of incapacity, testified as to the results of a number of tests administered to Defendant. The results of these tests were: borderline normal/impaired score on the California Learning Test, low/mildly impaired score on the Speech Sound Perception Test, mild to moderately impaired on the Seashore Rhythm test, low normal to normal on the Delayed Recall Test, normal *269 on the Memory Test, normal on the Ground Peg Board and Trials A & B Tests, above normal on the Visual Synthesis Test, and good to normal on the Webster Memory Test. Dr. Schram also testified that the Defendant scored in the low normal range on the Judgment Test. Defendant scored below normal in the Digits Forward and Digits Backwards Test, which according to Dr. Schram, indicates that something is not right with the brain. Dr. Schram opined that the pattern on the test he administered indicates that the Defendant has an attention and concentration problem, which is indicative of organic brain damage. Although the test suggests impairment in Defendant's attention and concentration abilities, Dr. Schram was unable to either definitively determine that Defendant suffers from brain damage, or find that Defendant is impaired in his everyday functioning.
Dr. Spencer found the Defendant has an anti-social personality disorder, but found no clinical evidence of significant brain damage. He testified that he personally observed that the Defendant could change his approach when confronted with information, known as changing sets. Dr. Spencer videotaped his interview with the Defendant. A portion of the tape was presented as evidence. [State's exhibit 3.] The video clearly showed that the Defendant was capable of changing sets in the way he altered his mind set when responding to Dr. Spencer. As noted by Dr. Spencer, the tape revealed that the Defendant can become agitated, and not become violent. He can control his anger. Dr. Spencer also stated that it was possible to suffer from brain damage that is not detected or detectable. He stated that he did not see anything in his test results or in his interview with the Defendant that was indicative of organic brain damage.
Dr. Ansley provided a neuro-psychological evaluation. She testified that the results of her evaluation showed no indication of any organic brain damage and no executive function deficit. Dr. Ansley had reviewed the Defendant's medical history and the raw data from the testing performed by all of the aforementioned experts. She concluded that this data was valid and reliable, and integrated it into tests she performed on her own. Her findings, like those of Dr. Spencer, were that the Defendant has an anti-social personality disorder and type D on the McGarty scale. This type of individual, according to Dr. Ansley, generally does not do well in treatment as the person does not accept responsibility in general.
Dr. Ansley relied on Dr. Schram's report that indicated that the Defendant has no memory deficiency. She testified that memory is the most easily injured aspect of brain functioning due to brain damage. She found that the results of Dr. Schram's report indicated the Defendant had borderline perseveration. Perseveration is a measure of one's loss of ability to engage in straight forward communication. A person will start and stop if the brain is injured. To determine the amount of perseveration, Dr. Ansley administered the Miami Learning Test, which is a verbal learning test where the subject has to repeat what the tester said. The Defendant had normal scores on this test. Dr. Schram's report stated that there was perseverance in the area of attention. Dr. Ansley gave the Defendant the Wexler Memory Scale 3 Test and concluded that the Defendant was low average to borderline.
Dr. Ansley testified that attention is one of the most basic skills for any test given. A lack of attention will impact the results of all other test. She performed the Digits Forward and Digits Backwards tests. The *270 Defendant had no performance problems on the Digits Forward test. She testified that he had some problems on the Digits Backwards test. Dr. Ansley stated that she, herself, took the Digits Backwards test and her score was similar to that of the Defendant. Dr. Ansley found that, in general, the Defendant performed in the low average range on all the tests. Interestingly, she concluded that he performed as well on tests that do not require great attention as on tests that require attention to do well.
Dr. Ansley explained that executive functioning is the most complex behavior. It is observable when it is present and when it is absent. It is that part of the functioning of the brain that enables us to make choices, to know what and what not to say, to problem solve, to think on our feet. To test the Defendant's executive functioning she used tests that are designed so that you figure it out. Because Dr. Schram's report noted deficits in cognitive flexibility, or the ability to change course, Dr. Ansley used the Wisconsin test. In this test, four cards are put on the table. There are different figures, colors and numbers on the cards. The subject is given a card and asked to put the card where it belongs. All the examiner says is right or wrong. Cards can be put with the same number, the same color, or shape. The examiner changes the category without telling the subject. It tests the ability to deal with feedback. Then the category is changed again. The Defendant did not have any problem with this test.
Dr. Ansley also testified that she had the Defendant perform the tactile performance test. In this test, the subject is blindfolded and has to place blocks in the right hole, using one hand, in a certain amount of time. The examiner only gives encouragement when the subject does it. It requires developing a strategy. Based on the results of the tests she conducted, as well as her review of Defendant's prison records, and the reports of the other expert witnesses, Dr. Ansley testified that she reached the conclusion that the head injuries and the drug usage reported by Defendant did not cause brain damage, and that the Defendant does not have any brain damage that would affect his ability to understand what he was doing when he killed the victim. Moreover, she concluded that it was a volitional choice to violate the restraining order.
This Court found the video tape of the interview of Dr. Spencer and the Defendant very helpful. The Court observed first hand how the Defendant has the ability to change his behavior as the situation changed. Additionally, the testimony of Dr. Ansley was extremely credible. Dr. Ansley had the benefit of the work of the other experts, and took it another step. Dr. Ansley concluded that the Defendant does not suffer from organic brain damage. While Dr. Schram concluded that the Defendant may have brain damage, he is a neuro-psychologist, not a forensic neuro-psychologist. Dr. Schram has very little experience in the area of forensic cases. Dr. Ansley, on the other hand, is a forensic neuro-psychologist with vast experience, having worked on several hundred forensic cases. Due to her experience and expertise in the forensic neuro-psychology field, and the thoroughness of her work in this case, this Court finds her testimony to be extremely credible.
Although Mr. Mastos testified that he did not research whether he could conduct an investigation for penalty phase mitigating evidence without his client's cooperation and against the expressed wishes of his client, this Court finds that, under the circumstances of this case, the performance of trial counsel was within the parameters *271 of "prevailing professional norms". Strickland v. Washington, 466 U.S. [668] 688, 690 [104 S.Ct. 2052] (1984). The Court notes that Mr. Mastos used the majority of his efforts in the guilt phase and cannot be faulted for following the wishes of his client in the penalty phase. Chandler v. United States, 218 F.3d 1305 (11th Cir.2000). Furthermore, the Court is convinced that the proposed mitigation evidence would not have made any difference on the outcome of the sentence, therefore, counsel cannot be ineffective for failing to present such evidence.
NOTES
[1] On direct appeal, Cummings-El asserted: (1) the trial court erred in striking two jurors for cause; (2) the trial court erred in commenting on the defendant's right to remain silent; (3) the trial court erred in instructing on the HAC aggravating factor; (4) the trial court erred in finding HAC applicable; (5) the trial court erred in finding CCP applicable; and (6) Cummings-El's death sentence was disproportionate.
[2] In this motion, Cummings-El asserted: (1) trial counsel was ineffective for failing to preserve for appellate review the issue of the improper exclusion by the trial court of two venirepersons for cause; (2) trial counsel was ineffective for failing to call Daphne Roberts as a witness; (3) trial counsel was ineffective for failing to request separate verdict forms for the alternate theories of premeditation and felony murder, and for failing to object to the State's argument regarding the alternate theories; (4) trial counsel was ineffective for failing to object to the trial court's improper comment before the jury regarding Cummings-El's right to remain silent; (5) trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase of trial; (6) the trial court erred in applying murder in the course of a felony and CCP as aggravating factors because they were duplicative of the underlying theories of premeditation and felony murder; (7) the trial court improperly weighed the aggravating and mitigating factors; (8) trial counsel was ineffective for failing to request a second-chair lawyer to assist him during the trial; (9) cumulative errors that occurred during trial deprived Cummings-El of a fair trial; (10) the trial court improperly considered Cummings-El's statement that he wanted to be sentenced to death if he was found guilty; and (11) Florida's death penalty is an unconstitutional form of cruel and unusual punishment.
[3] Huff v. State, 622 So.2d 982 (Fla. 1993).
[4] Cummings-El's additional claims were: (12) trial counsel was ineffective for failing to argue that CCP was not applicable in a domestic case; (13) trial counsel was ineffective for failing to object to the cumulative testimony of Daisy and Michael Adams in the penalty phase; and (14) trial counsel was ineffective for failing to interview Cummings-El's mother and sister for mitigation purposes.
[5] Cummings-El asserted: (15) the victim's son, Tadarius Williams, had recanted his identification testimony of Cummings-El after the trial.
[6] We find that the record clearly establishes that these six claims are without merit. The trial court order in respect to these claims is attached as Appendix I.
[7] The portion of the trial court's order denying this claim is attached as Appendix II.