PER CURIAM.
 

 Appellant Ronald Palmer Heath seeks review of an order which denied him post-conviction relief under Florida Rule of Criminal Procedure 3.851. Heath challenged his capital murder conviction for which a sentence of death was imposed. This Court possesses jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 Guilt and Penalty Phases
 

 A jury convicted Ronald Palmer Heath of the first-degree murder of Michael Sheridan, armed robbery, conspiracy to commit uttering a forgery, conspiracy to commit forgery, forgery (seven counts), and uttering a forgery (seven counts).
 
 See Heath v. State,
 
 648 So.2d 660, 662-63 (Fla.1994). For the murder of Sheridan, the jury recommended the death penalty by a vote of ten to two.
 
 See id.
 
 at 663. Following that recommendation, the trial court sentenced Heath to death for the murder.
 
 See id.
 

 [1]
 

 In its opinion affirming the imposition of the death penalty, the Court detailed the facts surrounding the murder:
 

 Heath and his younger brother, Kenneth, drove to Gainesville to visit some of Heath’s friends. On May 24, 1989, the brothers went to the Purple Porpoise Lounge in Gainesville where two of Heath’s friends worked as waitresses. Sometime during the evening the brothers struck up a conversation with Sheridan, a traveling salesman who had come to the lounge for drinks and dinner. Sheridan bought the brothers a drink and inquired if they ever got high or had any marijuana. Heath suggested to Kenneth that they take Sheridan somewhere and rob him; Kenneth agreed. The trio left the bar in Kenneth’s vehicle, which Heath drove to an isolated area of Alachua County. After parking on a dirt road, all three got out of the car and smoked marijuana. Heath made the hand motion of a pistol and asked Kenneth, “Did you get it?” Kenneth retrieved a small-caliber handgun from under the car seat, pointed it at Sheridan, and told him that he was being robbed. Sheridan balked at giving the brothers anything. Heath told Kenneth to shoot Sheridan. When Sheridan lunged at Kenneth, Kenneth shot him in
 
 *1020
 
 the chest. Sheridan sat down, saying “it hurt.” As Sheridan began to remove his possessions, Heath kicked him and stabbed him in the neck with a hunting knife. Heath attempted to slit Sheridan’s throat, but was unable to complete the task with the dull knife and could only saw at Sheridan’s neck. Heath then instructed Kenneth to kill Sheridan with the gun, and Kenneth shot him twice in the head. The brothers moved the body further into the woods. After returning to the Purple Porpoise, the brothers took Sheridan’s rental car to a remote area, removed some items, and burned the car.
 

 The next day the brothers used Sheridan’s credit cards to purchase clothes, shoes, and other items at a Gainesville mall.... The brothers returned to Jacksonville and tossed the handgun into the St. John’s River. The handgun was never recovered. Heath eventually returned to the trailer which he shared with Powell [his girlfriend] in Georgia.
 

 A medical examiner was dispatched to the scene of the murder on May 30, 1989, to examine the body, which was in a moderately advanced state of decomposition. The examiner estimated that death had occurred three to ten days earlier and that death was caused by multiple gunshot wounds and a sharp force injury to the neck.
 

 Several weeks after the murder, Heath was arrested at his trailer for using the stolen credit cards. Powell granted the officers permission to search the trailer and her car. The officers discovered some of the clothes purchased in Gainesville and Sheridan’s watch.
 

 Both brothers were indicted for the first-degree murder and armed robbery of Sheridan.... Kenneth entered into a plea agreement wherein he pled guilty to the charges and agreed to testify about Sheridan’s murder. Kenneth was sentenced to life imprisonment without eligibility for parole for twenty-five years for the murder conviction.
 

 Heath’s trial commenced on November 5, 1990. The primary evidence linking Heath to the crime was the testimony of Kenneth, Heath’s possession of a watch which could be traced to Sheridan through its serial number, and Heath’s possession of certain merchandise acquired in Gainesville with Sheridan’s stolen credit cards.
 

 Id.
 
 at 662.
 

 In imposing the death sentence, the trial court found two aggravating factors: (1) Heath had been convicted of a prior violent felony (second-degree murder), and (2) the murder was committed during the course of an armed robbery.
 
 See id.
 
 at 663. With regard to mitigation, the trial judge found one statutory mitigating circumstance — that Heath was under the influence of an extreme mental or emotional disturbance as a result of his consumption of alcohol and marijuana — and two non-statutory mitigating circumstances — that Heath demonstrated good character in prison, and that codefendant Kenneth Heath received a life sentence.
 
 See id.
 

 Direct Appeal
 

 In his direct appeal, Heath raised the following issues: (1) the trial court erred when it overruled Heath’s objection to a comment by the State during opening statements which reflected on Heath’s right to remain silent; (2) the trial court erred when it permitted testimony with regard to Sheridan’s good character; (3) the trial court erred when it admitted the testimony of cellmate Wayburn Williams, which addressed Heath’s plans to escape from pretrial detention; (4) the trial court erred when it ruled that the testimony of Heath’s employer was irrelevant; (5) the trial court improperly excluded a statement that Heath made to his girlfriend as
 
 *1021
 
 he unpacked his luggage upon his return from Florida; (6) the trial court erred when it sentenced Heath to death because he was no more culpable than his brother Kenneth, who received a life sentence; (7) the trial court erred when it read to the jury an unconstitutionally vague instruction with regard to the heinous, atrocious, and cruel aggravating circumstance; (8) the trial court erred when it sentenced Heath as a habitual offender for the crime of armed robbery; and (9) the habitual felony offender statute is unconstitutional because it violates due process and equal protection.
 
 See id.
 
 at 663-66. This Court denied relief on all claims and affirmed Heath’s convictions and sentences.
 
 See id.
 
 at 666.
 
 [2]
 

 Postconviction Proceedings
 

 On August 2, 2004, Heath filed his initial rule 3.851 motion. On April 18, 2005, Heath filed an amended rule 3.851 motion which raised twenty claims.
 
 [3]
 
 After a
 
 Huff
 

 [4]
 

 hearing, the trial court granted an eviden-tiary hearing on nine of the claims and denied the remainder.
 
 [5]
 

 
 *1022
 
 A primary focus of the evidentiary hearing involved the recanted testimony of Kenneth Heath, the key witness for the State during Heath’s trial, and Heath’s codefendant, who shot Sheridan three times. During the evidentiary hearing, Kenneth recounted that on the night of the murder he informed Heath that Sheridan wanted to smoke marijuana. Heath responded to Kenneth that they could rob Sheridan, and Kenneth agreed. Kenneth and Heath, before leaving the bar, discussed eliminating Sheridan as a witness. Prior to their departure from the bar, Sheridan expressed doubts about leaving with the brothers because he had a morning meeting; however, Sheridan was ultimately convinced to join the brothers.
 

 The three left the bar together and drove in Kenneth’s car to a remote area. While they were standing at the back of the car preparing to smoke, Heath used hand gestures to inquire whether Kenneth had the gun that the brothers carried in the vehicle. When Kenneth said “no,” Heath indicated to Kenneth that he should retrieve the gun from the car. After doing so, Kenneth pointed the gun at Sheridan and told him that he was being robbed. Sheridan initially believed the brothers were joking and said, “You’re kidding, right?” Heath then told Kenneth to shoot Sheridan. Kenneth told Sheridan, “Look, I don’t want to shoot you. Just take your wallet off and remove your jewelry and stuff.” Heath again told Kenneth to shoot Sheridan. Sheridan lunged at Kenneth, and Kenneth shot him in the chest. Sheridan took a couple of steps backward and sat down.
 

 Heath told Sheridan to remove his jewelry and when Sheridan did not move quickly enough, Heath removed Sheridan’s jewelry, watch, and wallet. Heath then asked Sheridan where a particular bracelet was, saying, “Give us the bracelet, we’ll get you to a hospital, we’ll get you some help.” When Sheridan did not respond, Heath kicked him. Heath told Kenneth to “shoot him again, to make sure he was dead,” and Kenneth shot Sheridan in the head. After that second shot, Heath repeated, “Shoot him again, shoot him again.” According to Kenneth, after the shot to the head, Sheridan continued to look at him and even asked Kenneth what he was doing. When Kenneth fired the third shot, “the life went out of his eyes.”
 

 The brothers moved Sheridan’s body further back into the woods so that it would not be discovered and returned to Kenneth’s vehicle. Heath then told Kenneth that he thought he might have dropped something and went back into the woods to look for it. Although Heath told Kenneth to wait in the car, Kenneth feared that someone might arrive because of the gunshots and, after a few minutes, went to see what Heath was doing. When Kenneth arrived at the place where Sheridan’s body was located, he saw Heath kneeling down and sawing at Sheridan’s throat with a knife. According to Kenneth, Heath “looked kind of lost and — like he was in ecstasy or something.” Kenneth asked Heath what he was doing and “when I spoke, it was like I snatched him out of a trance or something. I mean, you know, he looked at me, you know, kind of crazy.” The brothers then returned to the car and drove back to the Purple Porpoise.
 

 During cross-examination, the State reviewed Kenneth’s prior sworn statement, and the following dialogue occurred:
 

 STATE: (reading from sworn statement) Did you say: “The knife wouldn’t cut his throat, it was too dull?”
 

 KENNETH: After he had been shot three times.
 

 STATE: (reading from sworn statement) “So he stuck the knife in his throat and started cutting the throat like that.”
 

 
 *1023
 
 KENNETH: Yes, sir.
 

 STATE: (reading from sworn statement) “Any sounds from Michael Sheridan?”
 

 “What sounds?”
 

 “Like he was trying to swallow.” Correct?
 

 KENNETH: Yes, sir.
 

 STATE: So Michael Sheridan was still alive at the time your brother was cutting his throat. He was still making noises.
 

 KENNETH: I don’t think he was alive. He didn’t bleed.
 

 STATE: Was he still trying to swallow? That’s what you said.
 

 KENNETH: I said that he made sounds. I don’t know if it was swallowing sounds or what—
 

 STATE: Does a dead man make sounds?
 

 KENNETH: Sure.
 

 POSTCONVICTION COUNSEL: Object, your Honor.
 

 KENNETH: Actually, a dead man does make sounds.
 

 Kenneth testified that his recollection of the events from that night has never wavered. When asked about his prior testimony during the trial — i.e., that Heath stabbed Sheridan in the throat
 
 after
 
 he was shot in the chest, but
 
 before
 
 he was shot in the head — Kenneth testified, “Well, the truth is what I said at the trial and what I’m saying today. I spoke the truth at the trial. It appears to me that the statements that I made at the trial have been altered.” With regard to the relationship between Kenneth and Heath, Kenneth testified, “My brother’s the only person I ever feared.” Kenneth also testified that when he was younger, Heath abused him both physically and sexually. Finally, Kenneth admitted that his mother wanted him (Kenneth) to try to save Heath’s life.
 

 During the evidentiary hearing, Heath also called Dr. Darren Rothschild, a physician and psychiatrist who conducted a psychological evaluation of Heath; Heath’s parents, Vivian and William; and Sheila Short, who worked as a correctional officer during Heath’s trial. The State called Dr. Harry Krop, who evaluated Heath during his criminal trial, and one of Heath’s trial attorneys. After the evidentiary hearing, the postconviction court issued an order that denied the remainder of the claims raised by Heath in his amended rule 3.851 motion.
 

 II. ANALYSIS
 

 Newly Discovered
 
 Evidence—
 
 Recanted Testimony
 

 Heath first contends that the postconviction court should have granted a new trial based upon the newly discovered evidence of Kenneth Heath’s recanted testimony. This Court has addressed claims of newly discovered evidence and stated:
 

 [A] defendant must meet two requirements: First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
 
 See Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998)
 
 (Jones II).[
 

 6
 

 ]
 
 Newly discovered evidence satisfies the second prong of this test if it “weakens the case against [the defendant] so as to give rise to a reason
 
 *1024
 
 able doubt as to his culpability.”
 
 Id.
 
 at 526 (quoting
 
 Jones v. State,
 
 678 So.2d 309, 315 (Fla.1996)
 
 (Jones
 
 I)). In determining whether the evidence compels a new trial, the trial court must “consider all newly discovered evidence which would be admissible,” and must “evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.”
 
 Jones v. State,
 
 591 So.2d 911, 916 (Fla.1991). This determination includes
 

 whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
 

 Jones II,
 
 709 So.2d at 521 (citations omitted).
 

 When the trial court rules on a newly discovered evidence claim after an evi-dentiary hearing, we review the trial court’s findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence.
 
 Melendez v. State,
 
 718 So.2d 746, 747-48 (Fla.1998);
 
 Blanco v. State,
 
 702 So.2d 1250, 1251 (Fla.1997).
 

 Green v. State,
 
 975 So.2d 1090, 1099-1100 (Fla.2008). This Court has noted that recanted testimony is “exceedingly unreliable,” and if a trial court is not satisfied that the recanted testimony is true,
 
 it lias a duty to deny the defendant a new trial. Consalvo v. State,
 
 937 So.2d 555, 561 (Fla.2006) (quoting
 
 Armstrong v. State,
 
 642 So.2d 730, 735 (Fla.1994)). This Court is highly deferential with regard to a trial court’s determination concerning the credibility of a recantation and will affirm such a determination if it is supported by competent, substantial evidence.
 
 See Archer v. State,
 
 934 So.2d 1187, 1196 (Fla.2006).
 

 In the instant case, the postconviction court, in a well-written denial order, concluded that Kenneth’s recanted testimony was unreliable for four reasons:
 

 First, Kenneth Heath’s testimony is inconsistent with the medical examiner’s trial testimony that the cause of death was gunshot and a sharp force injury to the neck.
 

 Second, Kenneth Heath’s testimony is internally inconsistent. For instance, while Kenneth Heath claimed at the evi-dentiary hearing that the victim was dead at the time the defendant cut and stabbed at the victim’s throat, Kenneth Heath did not recant his previous testimony that Michael Sheridan was making noises at the time Heath tried to cut this throat. While in the previous testimony at trial, Kenneth Heath described the sounds as “like he was toying to swallow,” Kenneth Heath testified at the evi-dentiary hearing that he did not know if the sounds Mr. Sheridan was making were “swallowing sounds, or what.” Nevertheless, according to Kenneth Heath, Michael Sheridan was still making sounds at the time the defendant stabbed him in the throat. This testimony directly contradicts his claim that Michael Sheridan was already dead when the defendant stabbed and sawed at his throat with a knife.
 

 Third, Kenneth Heath revealed his motivation for testifying for his brother during the collateral proceedings. When asked whether his mother wanted him to try to save Heath’s life, he said, yes that “she doesn’t want to see Ronnie die.” Kenneth Heath had a motive to alter his trial testimony and this court believes it is appropriate to consider that motive as one factor in determining whether Kenneth Heath’s “recanted” testimony as to the order of wounds is credible.
 

 
 *1025
 
 Finally, Kenneth’s Heath’s demeanor on the witness stand and explanation for his changed testimony [i.e., that someone altered the court documents] belies any notion that his testimony as to the order of wounds is credible.
 

 As reflected in the procedural history, each of the postconviction court’s findings is supported by the record. Further, it is indubitably more logical to assume that Kenneth changed his testimony based upon a request from his distressed mother than it is to claim that all court documents related to Heath’s trial had somehow been altered. We conclude that that the trial court’s finding with regard to the credibility of Kenneth’s recantation is supported by competent, substantial evidence, and we affirm this determination.
 
 See Archer,
 
 934 So.2d at 1196.
 

 The postconviction court further concluded that even if Kenneth’s testimony was credible, it was not of such nature that it would probably produce an acquittal. We agree. Regardless of whether Heath stabbed Sheridan in the throat while he was still alive or only after he was dead, Heath could still be convicted as a principal of either premeditated murder or first-degree felony murder. Section 777.011, Florida Statutes (1989), discusses the concept of a first-degree principal to a crime:
 

 Whoever commits any criminal offense against the state, whether felony or misdemeanor, or
 
 aids, abets,
 
 counsels, hires, or otherwise
 
 procures such offense to be committed,
 
 and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such....
 

 (Emphasis supplied.)
 
 See also Ferrell v. State,
 
 686 So.2d 1324, 1329 (Fla.1996) (affirming first-degree murder conviction and death sentence where the defendant played an integral role in the crimes and in luring the victim to his death even though defendant did not pull the trigger).
 

 During the evidentiary hearing, Kenneth testified that while he and Heath were still at the Purple Porpoise, they discussed killing Sheridan after the robbery so there would be no witnesses. Thus, the brothers were contemplating murder even before they left the bar, and the murder of Sheridan was premeditated.
 
 See Perry v. State,
 
 801 So.2d 78, 84 (Fla.2001) (“‘Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill.’ This purpose to kill must exist for such a time before the homicide ‘to permit reflection as to the nature of the act to be committed and the probable result of that act.’ ” (quoting
 
 Green v. State,
 
 715 So.2d 940, 943-44 (Fla.1998))). Further, the death of Sheridan occurred during the course of an armed robbery, thereby rendering the crime felony murder.
 
 See
 
 § 782.04(1)(a), Fla. Stat. (1989).
 

 The record here demonstrates that Heath spearheaded the events that led to the murder of Sheridan. While at the Purple Porpoise, Heath suggested that he and Kenneth rob Sheridan. Once they were at the remote site, Heath told Kenneth to retrieve a gun from the vehicle. Once Kenneth shot Sheridan in the chest, Heath removed Sheridan’s jewelry, wallet, and watch. When Sheridan failed to respond to inquiries by Heath, he kicked Sheridan. Heath then urged Kenneth to shoot Sheridan to make sure he was dead. After Kenneth shot Sheridan in the head, Heath urged, “Shoot him again, shoot him again.” After Sheridan was dead, Heath and Kenneth moved the body further into the woods so that it could not be discovered. Heath unquestionably aided, abetted, and procured the murder of Sheridan. We conclude that even if Heath received a new trial, Kenneth’s recanted testimony is not of such nature that it would probably pro
 
 *1026
 
 duce an acquittal of Heath or even a conviction on a lesser charge.
 

 We further conclude that Kenneth’s testimony is not of such a nature that it would probably produce a life sentence recommendation. The two aggrava-tors found by the trial court in the sentencing order were (1) Heath had been convicted of a prior violent felony (second-degree murder), and (2) the murder, was committed during the course of an armed robbery.
 
 See Heath,
 
 648 So.2d at 663. With regard to Heath’s prior murder conviction, Detective Gerald Parker testified during the trial about the injuries sustained by the victim, Michael Lee Green. Green’s body was found approximately 250 feet from a severely burned vehicle. Green had sustained twenty-three stab wounds and his skull was crushed. The apparent weapon used to inflict the damage to Green’s skull was a burned tree stump which was covered with dried blood and matted hair.
 

 The sworn statement of Heath with regard to the murder of Green was read to the jury. In that statement, Heath testified that he stabbed Green because Green made unwelcome sexual advances toward him. When Green asked for help after the stabbing, Heath told him to get in his (Green’s) car and Heath would drive him to the hospital. However, Heath instead drove the car around and eventually returned to the site where the stabbing occurred. Heath then set the car on fire while Green was inside and leaned on the door to prevent Green from escaping. However, Green did manage to exit from the other side of the vehicle. While Green sat on the ground, watching his car burn, Heath started kicking him. The two struggled, and Heath proceeded to stab Green in the chest and in the back. When Green grasped Heath’s leg, Heath grabbed the stump and struck Green with it three times. Heath then dragged Green’s body into the bushes.
 

 Kenneth’s recanted testimony does not disprove either of the aggravators found by the trial court in its sentencing order. Indeed, as noted in the order denying postconviction relief, the recanted testimony actually establishes two
 
 additional
 
 statutory aggravating circumstances: the murder was committed to eliminate a witness and was cold, calculated, and premeditated. Given the disturbing facts of the Green murder, which was committed by Heath when he was sixteen years old, and the additional evidence that (1) Heath and Kenneth discussed killing Sheridan even before they left the Purple Porpoise, and (2) Heath appeared to be “in ecstasy” when he sawed at the throat of Sheridan’s dead body, we conclude that Kenneth’s recanted testimony is not of such a nature that it would probably produce a life-sentence recommendation for Heath.
 

 Accordingly, we affirm the trial court’s denial of this claim.
 

 Ineffective Assistance
 
 — Voluntary
 
 Intoxication Defense
 

 Heath next claims ineffective assistance of counsel during the guilt phase of his trial due to the failure to investigate and consider a defense of voluntary intoxication. After the decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was issued by the United States Supreme Court, this Court explained that to establish an ineffective assistance of counsel claim, two requirements must be satisfied:
 

 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and relia
 
 *1027
 
 bility of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted). Both prongs of the
 
 Strickland,
 
 test present mixed questions of law and fact, and, therefore, this Court employs a mixed standard of review. We defer to the circuit court’s factual findings that are supported by competent, substantial evidence, but review the legal conclusions of the circuit court de novo.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004).
 

 There is a strong presumption that the performance of trial counsel was not ineffective.
 
 See Strickland,
 
 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Id.
 
 at 689, 104 S.Ct. 2052. The defendant bears the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ”
 
 Id.
 
 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). We have held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 
 Occhicone v. State,
 
 768 So.2d 1037, 1048 (Fla.2000).
 

 We conclude that Heath has failed to demonstrate ineffective assistance on this claim. During the evidentiary hearing, trial counsel testified that he and Heath met numerous times when formulating his defense. His attorney testified that they specifically discussed a voluntary intoxication defense. Counsel stated that he felt the alibi defense was much stronger than an intoxication defense for two reasons. First, Heath never once acknowledged to counsel that he was present at the crime scene. Instead, Heath consistently insisted that he was not culpable because he was not there. Moreover, there were witnesses whose testimony supported this defense. During trial, one inmate testified that Kenneth informed him that he (Kenneth) had killed Sheridan, and Heath was not present. A second inmate testified that Kenneth stated he shot Sheridan a couple of times and then cut his throat because “he pissed me off, he wouldn’t die.” Finally, a third inmate testified that when Kenneth returned from a meeting with his lawyer, he was very angry because he said that Heath would not lie for him.
 

 Second, counsel testified that he did not believe an intoxication defense was viable because “it’s a very difficult defense for a jury to accept, particularly in serious— when serious criminal activity is alleged .... It’s just been my experience that people do not accept someone not taking responsibility due to voluntary intoxication.” The attorney also explained that he does not believe in presenting multiple inconsistent defenses because he feels it harms the credibility of the defense team: “You can’t take one position and then say, well, if you don’t believe that, here’s my second argument. It just does not work. You lose credibility. And in my experience, every jury trial is a battle, at least in part, for credibility.” Finally, counsel testified that he did not feel an intoxication defense was viable because evidence reflected that, around the time of the murder, Heath and Kenneth were
 
 *1028
 
 making decisions and driving an automobile.
 
 [7]
 

 Based on these two factors, trial counsel chose to exclusively pursue an alibi defense and contend that Kenneth was implicating Heath solely to obtain the benefit of a plea bargain that spared him from the death penalty. A review of the closing statements during trial reflects this defense strategy:
 

 You know, one thing that [Kenneth] said, too, sums up the whole case. If he would have gotten on that stand and told you, “Ronnie wasn’t there,” he knew he would face the possibility of the death penalty then, if he said that. So could he [say] it — would he say it? Could this thief, liar, and murderer say that? He’s doing it to save himself.
 

 Before there was any plea-deal, what did he say? He told the police, “Ronnie wasn’t there.” He told Wilbur Johnson, “Ronnie was there at the bar; he didn’t go with me; I was alone when I committed the crime.”
 

 And what changed? The plea-deal? And the story changed. Just enough to shift some blame: “Ronnie told me to do it. Ronnie told me to do it.”
 

 [[Image here]]
 

 So can you be so sure of Kenny’s testimony to bet a human life on it? Did he not have the greatest reason to lie? Self-preservation? Self-preservation— just shift the blame a little bit; he didn’t like Ronnie anyway. That’s reasonable doubt.
 

 No evidence, not one bit of evidence given to you supports Kenny’s story. Not one. There is no physical evidence. None.
 

 Trial counsel testified during the evidentia-ry hearing that Heath agreed with a defense that he was not present during the murder, that Kenneth only told him about the killing after it occurred, and that Kenneth was lying because he had arranged a plea bargain with the State.
 

 In light of the evidence offered during the evidentiary hearing, we conclude that trial counsel’s performance was not deficient for the failure to present an intoxication defense. Heath presented no evidence during the evidentiary hearing to negate trial counsel’s testimony that a voluntary intoxication defense was considered, but ultimately rejected, or to dispute that Heath agreed with his attorney’s decision to pursue the alibi defense. Since Heath never admitted being at the crime scene, it would have been inconsistent for trial counsel to argue that he was present and assisted in the murder of Sheridan, but was too intoxicated to know what he was doing. Further, the decision to not present inconsistent defenses for fear of harming credibility with the jury was a matter of trial strategy.
 
 (See Remeta v. Dugger,
 
 622 So.2d 452, 455 (Fla.1993) (trial counsel not ineffective for making a tactical decision not to present a voluntary intoxication defense where the theory of the defense was that an accomplice was “the primary perpetrator and trigger man in the killing [and a]n intoxication defense would be inconsistent with Remeta’s contention that he did not commit the crime”)(quoting trial court’s order)). Moreover, witnesses were available who
 
 *1029
 
 could (and did) testify in favor of Heath’s alibi defense.
 
 Cf. id.
 
 at 455 (“The decision not to present a voluntary intoxication defense was a tactical one based on what Remeta’s counsel felt the facts of the case supported.”). The fact that this defense strategy was ultimately unsuccessful with the jury does not render counsel’s performance deficient.
 
 See Johnson v. State,
 
 769 So.2d 990, 1001 (Fla.2000) (“Simply because the ... defense did not work, it does not mean that the theory of the defense was flawed.” (quoting trial court’s order)).
 

 In light of the foregoing, we affirm the holding of the postconviction court that trial counsel was not ineffective for failing to present a voluntary intoxication defense.
 

 Ineffective Assistance
 
 — Mitigation
 

 Heath next asserts that trial counsel was ineffective during the penalty phase for the failure to investigate and present a number of mitigating circumstances.
 
 [8]
 
 We address each alleged basis for mitigation separately.
 

 Antisocial Personality
 
 Disorder— During the evidentiary hearing, Dr. Rothschild testified that Heath satisfied the criteria for a diagnosis of antisocial personality disorder (APD). Dr. Rothschild testified that APD is characterized by a pervasive pattern of behavior that involves disregard for others and the law, and the pattern must have commenced prior to the age of fifteen. According to Dr. Rothschild, when the pattern emerges before the age of fifteen it is termed a conduct disorder, which is characterized by aggression, property destruction, deceitfulness, theft, and serious rule violations. Dr. Rothschild testified that Heath met the criteria for conduct disorder because he had been physically cruel to others, he had broken into homes on a number of occasions and lied to cover it up, and he had ignited multiple fires. Dr. Rothschild testified that a person with APD can control his or her behavior, but chooses not to, and disregards the consequences of his or her actions.
 

 Dr. Krop testified that when he evaluated Heath during trial preparation, he too reached a diagnosis of APD. Dr. Krop explained his view with regard to offering testimony that Heath met the criteria for an APD diagnosis:
 

 [Although I could try and soften that to some degree by saying things like a person’s not born with [APD], its traits that are resultant to the environment that he is brought up in, my experience has been in talking to jurors after cases that [APD is] essentially viewed in a very negative manner.
 

 [[Image here]]
 

 So depending on what I was asked upon cross-examination, certainly I felt that I might present Mr. Heath in a negative manner.
 

 Krop eventually wrote a letter to counsel that memorialized their collective decision with regard to his testimony: “As a result of our mutual concerns that Mr. Heath’s psychological profile might be damaging to his case, you have agreed that I not testify during his sentencing.” During the evi-dentiary hearing, trial counsel recalled that both defense counsel and Dr. Krop agreed that he should not testify during the penalty phase.
 

 
 *1030
 
 The record reflects that trial counsel was aware of the APD diagnosis but chose not to present this evidence to the jury. This was a reasonable strategic decision based upon a belief that such evidence would harm rather than help Heath’s penalty phase presentation.
 
 See Asay v. State,
 
 769 So.2d 974, 985 (Fla.2000) (“[I]n those cases where counsel did conduct a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information, we have affirmed the trial court’s findings that counsel’s performance was not deficient.”);
 
 Freeman v. State,
 
 858 So.2d 319, 327 (Fla.2003) (concluding that APD is “a trait most jurors tend to look disfavorably upon”). We conclude that the decision of trial counsel not to introduce Heath’s APD diagnosis into evidence during the penalty phase did not constitute deficient performance. Accordingly, Heath’s allegation of ineffectiveness fails on this basis.
 

 Alcohol Abuse
 
 — Contrary to Heath’s assertion, Dr. Rothschild did not provide a substance-abuse diagnosis. Instead, Rothschild testified that Heath had a history of substance abuse, but a diagnosis would be difficult because of his lengthy incarceration for many years immediately prior to this crime. Dr. Rothschild also stated that he believed Heath had minimized his reported alcohol use. Dr. Rothschild ultimately concluded that Heath
 
 did not
 
 have diminished capacity to appreciate the criminality of his conduct at the time of the murder. However, he qualified this statement, opining that the mitigator was not applicable according to the account of the crime that Heath provided to him.
 
 [9]
 
 During the evidentiary hearing, Dr. Krop stated that he and defense counsel had discussed the fact that Heath had been drinking on the night of the murder and that Heath’s judgment may have been compromised. However, Krop was uncertain if Heath had a substance-abuse problem that rose to the level of a clinical diagnosis.
 

 We conclude that no deficiency in representation occurred on this asserted basis. None of the experts diagnosed Heath as suffering from a substance abuse disorder because, of significant note, Heath had been incarcerated for the murder of Michael Green from the age of sixteen for a period of twelve years and was only released from prison a matter of months before the murder occurred in this case. Nonetheless, during the penalty phase, trial counsel offered evidence of Heath’s substance use both on the night of the murder and prior to his first incarceration. During the penalty phase, Heath’s parents testified that Heath used drugs on at least one occasion prior to his arrest for the murder of Green.
 

 Additionally, during closing statements, trial counsel specifically asserted in mitigation that Heath was highly intoxicated on that night:
 

 “Substantial impairment of reasoning abilities due to use of alcohol or drugs may constitute commission of a crime under the influence of extreme mental or emotional disturbance.”
 

 Well, does that apply? Sure does. What did these guys have that night? Well, Ronald Heath had about two pitchers of beer to drink, and some kind of a
 
 *1031
 
 drink, two drinks: something called a Long Island iced tea.
 

 [[Image here]]
 

 And marijuana — Jennifer Berquist ... says “Well, they were going in and out [of the Purple Porpoise] all night, smoking marijuana; them eyes were red and you could tell they were not so good.” And apparently they were smoking marijuana in the car on the way out to the crime scene.
 

 Substantial impairment? Decide for yourself ... whether that constitutes substantial impairment due to alcohol or drugs.
 

 Thus, trial counsel clearly presented Heath’s drug and alcohol use to the jury. Moreover, the trial court found in mitigation that Heath was under an extreme emotional or mental disturbance at the time of the crime due to the use of alcohol and marijuana, but gave the mitigator little weight because there did not appear to be a nexus between the consumption and the crime:
 

 From the description of the criminal activities, the Court can assume that Ronald Heath may have been influenced by alcohol or marijuana, but the consumption of alcohol and marijuana does not automatically lead to violence. Indeed, there is no evidence that alcohol or marijuana had any particular effect on the mental or emotional facilities of Ronald Heath, and the similarities between the killing of Michael Sheridan and the killing of Michael Green lead the Court to believe that Ronald Heath’s propensity to violence was not substantially enhanced by his consumption of alcohol or marijuana. The Court gave this mitigating circumstance weight but not great weight.
 

 Heath has failed to demonstrate any deficiency by trial counsel on this basis. Counsel presented Heath’s drug and alcohol use during the penalty phase and was successful in establishing the “extreme emotional distress” mitigating circumstance based upon this use.
 

 Physical Abuse
 
 — As with the antisocial-personality mitigating circumstance, Heath’s trial attorneys were aware that Heath’s father had disciplined Heath with corporal punishment. However, during the evidentiary hearing, trial counsel testified that Heath did not want any evidence to be presented during the penalty phase with regard to his childhood, his education, or his family relationships. We have held that counsel is not ineffective for complying with the requests of the defendant.
 
 See Cummings-El v. State,
 
 863 So.2d 246, 266 (Fla.2003);
 
 see also Grim v. State,
 
 971 So.2d 85, 97 (Fla.2007) (counsel not ineffective for failing to argue for lesser-included offenses where the defendant instructed counsel not to do so). Counsel testified that the strategy during the penalty phase was to present Heath’s parents in a positive light that would reflect well on Heath. Indeed, during the trial, both parents testified that when Heath started to get into trouble (e.g., stealing, skipping school), they obtained the assistance of a psychiatrist based on a concern for his actions. Further, William Heath testified that when Heath went to prison for the murder of Green, he attempted to secure psychological assistance for his son. William also testified that while Heath was incarcerated in Arcadia, Florida, at least once a month, the parents would drive seven hours to visit him.
 

 Thus, during the penalty phase, the Heaths were portrayed as concerned and loving parents who sought help for their son on more than one occasion for the psychological issues he faced. It would have been inconsistent for defense counsel to then undermine the credibility of those parents by introducing evidence that Heath’s father used corporal punishment.
 
 *1032
 
 Accordingly, even if Heath had permitted counsel to introduce evidence of corporal punishment, the decision not to introduce this evidence would constitute a reasonable trial strategy, and Heath has failed to demonstrate that his counsel was deficient during the penalty phase.
 
 See Gore v. State,
 
 964 So.2d 1257, 1269 (Fla.2007) (“[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” (quoting
 
 Occhicone,
 
 768 So.2d at 1048)).
 

 Substantial Domination
 
 — This Court has held that “counsel cannot be deemed deficient for failing to investigate or present mitigation evidence unless the defendant establishes that mitigation exists.”
 
 Holland v. State,
 
 916 So.2d 750, 757 (Fla.2005) (citing
 
 Gore v. State,
 
 846 So.2d 461, 469-70 (Fla.2003)). Heath failed to offer any evidence during the evidentiary hearing to demonstrate that Kenneth dominated Heath. Heath argues that Rothschild was of the opinion that, based on the family background and the relationship between Heath and Kenneth, it is unlikely that Kenneth acted pursuant to the direction of Heath. However, Rothschild actually testified that he could not formulate an opinion with regard to whether one brother dominated the other because of the discrepancies in their respective versions of the events on the night of the murder. Instead, Rothschild testified that Heath’s parents gave no indication that Kenneth dominated Heath.
 

 During cross-examination, Rothschild testified that he did not reach a conclusion that Kenneth controlled Heath at any time before the murder, or that Heath was a man who was easily led by others. Vivian Heath could not say whether one brother dominated over the other. William Heath testified that he never saw any evidence that Kenneth dominated Heath. Corrections officer Sheila Short said that the brothers were not incarcerated together, so she never had an opportunity to see if one brother dominated the other, if one was subservient to the other, or if Kenneth feared Heath.
 
 [10]
 
 Finally, trial counsel testified that there was no evidence that Kenneth dominated Heath, but evidence existed that Heath dominated Kenneth:
 

 Ronnie [Heath] was older than Kenny. He [Heath] was physically larger. He [Heath] appeared to be mentally quicker, more secure.
 

 Based upon my interactions with Ronnie [Heath], my interactions with Kenny, the way they both presented themselves, and then Kenny recounting some abuse that he claimed, there wasn’t evidence [that Kenneth dominated Heath],
 

 Given the lack of evidence offered during the evidentiary hearing that Kenneth dominated Heath, the fact that Heath physically and sexually abused Kenneth as a child, and Kenneth’s testimony during the evidentiary hearing that “[m]y brother’s the only person I ever feared,” trial counsel was not ineffective for failing to raise as a mitigating circumstance that Kenneth exercised substantial domination over Heath.
 
 See Holland,
 
 916 So.2d at 757.
 

 Unconstitutional “Doubler”
 
 — Under this claim, Heath contends that the “committed in the course of a felony” ag-gravator acts as an unconstitutional “doubler” — i.e., the same set of facts that support the felony-murder conviction also
 
 *1033
 
 support application of this aggravating circumstance. This Court has repeatedly rejected claims that the “committed in the course of a felony” aggravating circumstance constitutes an unconstitutional automatic aggravator (or a “doubler”).
 
 See Owen v. State,
 
 862 So.2d 687, 704 (Fla.2003) (citing
 
 Johnson v. Moore,
 
 837 So.2d 343, 348 (Fla.2002);
 
 Blanco v. State,
 
 706 So.2d 7, 11 (Fla.1997)).
 
 [11]
 
 Trial counsel is not ineffective for failing to raise a merit-less challenge,
 
 see Vining v. State,
 
 827 So.2d 201, 213 (Fla.2002), and Heath is not entitled to relief on this claim.
 

 Cause of Death
 
 — As previously noted, “counsel cannot be deemed deficient for failing to investigate or present mitigation evidence unless the defendant establishes that mitigation exists.”
 
 Holland,
 
 916 So.2d at 757. During the evidentiary hearing, trial counsel testified that the first time he received evidence that Heath stabbed Sheridan in the throat postmortem was in a affidavit signed by Kenneth Heath during February 2005, more than fourteen years after Heath’s trial occurred. According to counsel, Kenneth never reported this fact in any of the interviews that he conducted with Kenneth during Heath’s trial. Since Heath offered no evidence during the evidentiary hearing to demonstrate that this evidence was available at the time of Heath’s trial — other than Kenneth’s dubious assertion that his version of the murder has always been the same, but someone has altered the trial court records — Heath cannot demonstrate that his counsel was ineffective for failing to present it.
 

 Sexual Assaults in Prism
 
 — Both Dr. Krop and trial counsel testified that they were aware Heath had been the victim of sexual assaults while in prison. His trial attorney testified that he and cocounsel considered offering this evidence during the penalty phase in mitigation; however, Heath did not wish for this evidence to be presented. Heath failed to offer any testimony or evidence during the evidentiary hearing to repudiate the attorney’s testimony that Heath did not want trial counsel to present evidence of sexual abuse. Counsel is not ineffective for complying with the requests of the defendant.
 
 See Grim,
 
 971 So.2d at 97;
 
 Cummings-El,
 
 863 So.2d at 266. Accordingly, Heath has failed to demonstrate that he is entitled to relief on this claim.
 

 Miscellaneous claims
 
 — The remaining three mitigating circumstances that Heath claims counsel should have offered during the penalty phase are: (1) Heath was emotionally abused and neglected as a child; (2) Heath was a slow learner; and (3) Heath was suffering from extreme emotional distress at the time of the murder due to a breakup with his girlfriend, Penny Powell. However, during the evidentiary hearing, Heath failed to offer any solid evidence to support any of these contentions. Neither Dr. Rothschild nor Dr. Krop testified that Heath suffered from emotional abuse or neglect during his youth. Neither of Heath’s parents testified that Heath was emotionally abused or deprived. Instead, Heath’s father testified that when the school district planned to bus Heath to a school across town, the parents placed him in a private school so that Heath would not arrive home late in the afternoon or be forced to leave for school before daylight. Heath’s mother testified that the family was “constantly doing family things. We had a boat and ... we would go fishing and haul our dog along, and it was just normal.”
 

 
 *1034
 
 Similarly, there was no evidence offered to demonstrate that Heath was a slow learner. Instead, Dr. Krop testified that Heath’s prior IQ testing placed him in the bright/normal range. Further, all of Heath’s neurological screening tests were within the normal limits and there was no evidence that Heath had suffered a head injury. William Heath testified that prior to the sixth grade, Heath was a good student and “[u]p till about that time he was as close to a perfect child as you could want.” Vivian Heath testified that he “was actually an exemplary student up until the sixth grade, and that’s when things started to change with him.”
 

 Lastly, Dr. Krop testified that although Heath was upset about the breakup with Powell, he did not believe that it contributed to the murder. Dr. Krop testified that in his opinion, Heath was
 
 not
 
 under the influence of an extreme mental or emotional disturbance on the night of the murder. Moreover, trial counsel testified during the evidentiary hearing that when Heath discussed the breakup with Powell, he did not portray it as an extreme event. Further, counsel questioned the seriousness and permanency of the breakup because Powell was very helpful in Heath’s defense and was willing to come to Florida to testify on his behalf.
 

 Heath failed to offer any evidence during the evidentiary hearing to establish the existence of these potential mitigating circumstances. We conclude that Heath has failed to establish that his counsel was ineffective on these bases.
 
 See Holland,
 
 916 So.2d at 757 (“[C]ounsel cannot be deemed deficient for failing to investigate or present mitigation evidence unless the defendant establishes that mitigation exists.”).
 

 Ineffective Assistance
 
 — Special
 
 Verdict Form
 

 Heath next contends that he received ineffective assistance during the penalty phase due to the failure to request a special verdict form with regard to the specific aggravating factors found by the jury. However, this Court has previously rejected the contention that Florida’s capital sentencing structure is unconstitutional because it does not require a special verdict form that indicates the aggravating circumstances found by the jury.
 
 See Kormondy v. State,
 
 845 So.2d 41, 54 (Fla.2003). Additionally, in 2005 we held that it constitutes a departure from the essential requirements of law for a trial court in a death-penalty proceeding to utilize a penalty-phase special verdict form that details the findings of the jurors with regard to aggravating circumstances.
 
 See State v. Steele,
 
 921 So.2d 538, 550 (Fla.2005). Hence, had trial counsel presented this challenge during the trial proceedings, it would have been rejected. Trial counsel is not ineffective for failing to raise a merit-less challenge,
 
 see Vining,
 
 827 So.2d at 213, and Heath is not entitled to relief on this claim.
 

 Ineffective Assistance
 
 — Insufficiency
 
 of the Indictment
 

 In his next claim, Heath contends that he received ineffective assistance of counsel during the guilt phase based on a failure to challenge the indictment as insufficient because it did not allege the aggravating circumstances upon which the State intended to rely, in violation of the Supreme Court’s decisions in
 
 Ring
 
 and
 
 Blakely.
 
 However, we have held that
 
 Ring
 
 does not apply retroactively.
 
 See Johnson v. State,
 
 904 So.2d 400, 405 (Fla.2005)
 
 (“Ring
 
 does not apply retroactively in Florida to defendants whose convictions already were final when that decision was rendered.”). Since Heath’s conviction became final in 1995, these decisions do not apply to him.
 

 Moreover, this Court has held that capital defendants are “not entitled to notice of
 
 *1035
 
 every aggravator in the indictment because the aggravators are clearly listed in the statutes.”
 
 England v. State,
 
 940 So.2d 389, 407 (Fla.2006) (citing
 
 Lynch v. State,
 
 841 So.2d 362, 378 (Fla.2003)). Thus trial counsel was not ineffective for failing to raise this meritless claim.
 
 See Vining,
 
 827 So.2d at 213.
 

 Unanimous Jury
 

 Heath next contends that Florida’s sentencing structure is unconstitutional in violation of
 
 Ring
 
 because it does not require a unanimous jury to recommend a sentence of death. However, this Court has repeatedly held that Florida’s capital sentencing scheme does not violate the United States Constitution under
 
 Ring. See Jones v. State,
 
 845 So.2d 55, 74 (Fla.2003). Further, as previously noted,
 
 Ring
 
 does not apply retroactively.
 
 See Johnson,
 
 904 So.2d at 405.
 

 Accordingly, this claim is without merit.
 
 Jury Instruction
 

 In this claim, Heath appears to assert that because it was Kenneth who fatally shot Sheridan, the trial court improperly instructed the jury that Heath killed Sheridan. We conclude that this claim is procedurally barred. Heath is challenging a jury instruction, and this Court has explained that “[c]laims regarding the adequacy or constitutionality of jury instructions should be raised on direct appeal.”
 
 Israel v. State,
 
 985 So.2d 510, 520 (Fla.2008) (citing
 
 Thompson v. State,
 
 759 So.2d 650, 665 (Fla.2000)). Further, jury instructions “are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred.” Gar
 
 zon v. State,
 
 980 So.2d 1038, 1042 (Fla.2008) (quoting
 
 State v. Delva,
 
 575 So.2d 643, 644 (Fla.1991)). The record reflects that trial counsel did not object to the relevant instruction during the charge conference or when the trial court read the instruction to the jury, and Heath further did not challenge this instruction on direct appeal. Consequently, Heath’s jury-instruction claim is procedurally barred in this collateral context.
 
 [12]
 

 III. CONCLUSION
 

 For the foregoing reasons, we affirm the denial of the rule 3.851 motion by the postconvietion court.
 

 It is so ordered.
 

 QUINCE, C.J., WELLS, PARIENTE, LEWIS, CANADY, and POLSTON, JJ., and ANSTEAD, Senior Justice, concur.
 

 [1]
 

 . Heath was sentenced to life imprisonment as a habitual offender for the armed-robbery conviction.
 
 See id.
 
 With regard to the convictions for conspiracy to commit forgery and conspiracy to commit tittering a forgery, Heath was sentenced to six months with credit for time served.
 
 See id.
 
 With regard to the forgery and uttering-a-forgery convictions, Heath was sentenced to consecutive sentences of ten years as a habitual offender.
 
 See id.
 

 [2]
 

 . The Court concluded that the State imper-missibly commented on Heath's right to remain silent during opening statements, but held that the error was harmless beyond a reasonable doubt. See
 
 id.
 
 at 663.
 

 [3]
 

 . The claims presented were based on ineffective assistance of counsel: (I) during the
 
 penalty
 
 phase for the failure to develop Kenneth Heath's testimony; (II) during the
 
 guilt
 
 phase for tire failure to develop Kenneth’s testimony; (III) during the guilt phase for the failure to present voluntary intoxication as a defense and offer evidence that Heath was intoxicated as a mitigating circumstance; (IV) during the guilt phase for the failure to advise Heath of the availability of the voluntary intoxication defense; (V) during the penalty phase for the failure to raise as a mitigating circumstance the fact that Heath suffers from severe antisocial personality disorder; (VI) during the guilt phase for the failure to request a jury instruction on the voluntary intoxication defense; (VII) during the
 
 guilt
 
 phase for the failure to call witnesses to demonstrate that Heath acted under the domination of Kenneth; (VIII) during the
 
 penalty
 
 phase for the failure to call witnesses to demonstrate that Heath acted under the domination of Kenneth; (IX) during the guilt phase for the failure to call material witnesses; (X) during the guilt phase for the failure to ensure that Heath was present during all pretrial motion hearings and the allocution hearing; (XI) during the penalty phase for the failure to challenge the “committed in the course of a felony” aggravating circumstance, which constitutes an impermissible “doubler”; (XII) during the guilt phase for the failure to request a special verdict form which would require the jury to choose between premeditated murder and felony murder; (XIII) during the penalty phase for the failure to request a special verdict form which would require the jury to specify the aggravating factors found; (XIV) for the failure to assert that the indictment was insufficient because it failed to specify the aggravating circumstances upon which the State intended to rely; and (XV) for the failure to file motions to preserve challenges with regard to aggravating circumstances, jury override, and unanimous verdicts. The remaining claims raised were: (XVI) Kenneth's recanted testimony constitutes newly discovered evidence which, if introduced during the
 
 penalty
 
 phase, would have produced a life sentence for Heath; (XVII) Kenneth's recanted testimony constitutes newly discovered evidence which, if introduced during the
 
 guilt
 
 phase, would have resulted in Heath’s conviction for a lesser-included offense; (XVIII) the State committed a violation under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (XIX) the Supreme Court’s decisions in
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and
 
 Blakely v. Washington,
 
 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), require that Heath receive a new penalty phase; and (XX) section 921.141, Florida Statutes (1989), is unconstitutional.
 

 [4]
 

 .
 
 Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [5]
 

 . The postconviction court found that claims related to the failure to call witnesses and the failure to have Heath present at all hearings were insufficiently pled and denied these claims without prejudice.
 

 [6]
 

 . Where the newly discovered evidence is relevant to the penalty phase, the evidence must be of such a nature that it would probably produce a life sentence recommendation.
 
 See Rutherford v. State,
 
 926 So.2d 1100, 1108 (Fla.2006).
 

 [7]
 

 . Dr. Krop similarly did not believe that Heath’s alcohol and drug use on the night of the murder rose to the level for a defense of intoxication to have been viable:
 

 I can say my opinion was that it would not have, given Mr. Heath's very explicit, detailed account as to what happened. He—
 

 Again, I'm not talking about the veracity, necessarily, of what he told me, but he was able to give me specific directions and which way — which way someone turned and — -just a very detailed account as to the events in question. And I did not feel that he was that significantly intoxicated.
 

 [8]
 

 . We have considered Heath’s assertion that trial counsel improperly relied upon residual doubt during the penalty phase and reject this claim without further discussion. Further, we conclude that Heath has waived his cumulative-error claim because his brief includes no argument whatsoever and instead consists of a one-sentence heading in his brief. Vague and conclusory allegations on appeal are insufficient to warrant relief.
 
 See Doorbal v. State,
 
 983 So.2d 464, 482 (Fla.2008).
 

 [9]
 

 . Heath told Rothschild that he had "passed out” in the back seat of the car and, when he awoke, Kenneth was pointing the gun at Sheridan. He exited the car in an attempt to defuse the situation but Sheridan lunged at Kenneth, and Kenneth shot him. According to Rothschild, Heath stated that Kenneth had told him to take Sheridan's wallet and to cut his throat, apparently because Kenneth wanted to ensure that Heath was somehow involved in the murder.
 

 [10]
 

 . Short testified with regard to one incident where she heard Kenneth say while in the jail, "Ha, ha, I fixed his ass this time, didn’t I." When Short asked about whom he was speaking, Kenneth said "My brother,” and he did not behave as if he was afraid of Heath. However, during cross-examination, Short admitted that she was unsure of the context in which Kenneth made the statement.
 

 [11]
 

 .
 
 See also Pooler v. State,
 
 980 So.2d 460, 470 (Fla.) (“[C]laims that could have been raised on direct appeal cannot be relitigated under the guise of ineffective assistance of counsel.” (citing
 
 Freeman v. State,
 
 761 So.2d 1055, 1067 (Fla.2000))),
 
 cert.
 
 denied, -U.S. -, 129 S.Ct. 255, 172 L.Ed.2d 192 (2008).
 

 [12]
 

 . Similarly, Heath's claim that his death sentence is disproportionate is procedurally barred because this Court evaluated the proportionality of the sentence on direct appeal. Moreover, Heath did not raise the instant challenge before the postconviction court and, accordingly, this challenge will not be heard for the first time on appeal.
 
 See generally Connor v. State,
 
 979 So.2d 852, 866 (Fla.2007).